*In re* LEOPOLDO ROJAS FLORES, querellado.

*Número:* O-72-236      *Resuelto:* 3 de octubre de 1978

*Gilberto Gierbolini, Miriam Naveira de Rodón, Héctor A. Colón Cruz, Procuradores Generales; Roberto Armstrong, Jr., Peter Ortiz* y *J. F. Rodríguez Rivera, Procuradores Generales Interinos, Héctor R. Orlandi,* abogados de El Pueblo de Puerto Rico; *Pascual F. Lanauze Ortiz* y *Pedro Malavet Vega,* abogados del querellado.

El Juez Asociado Señor Díaz Cruz emitió la opinión del Tribunal.

Los hechos en que se funda esta acción de desaforo se retrotraen al 17 septiembre, 1956 cuando los sucesores de Teclo Pagán Lozada instaron ante la Sala de Guayama del Tribunal Superior, demanda sobre nulidad de actuaciones, reivindicación, cobro de dinero y daños y perjuicios contra Antonio Berríos y los albaceas Leopoldo Rojas Flores (querellado) y Martín Rosado. Dicha acción civil fue desestimada por sentencia de 30 junio, 1959 luego de repetidas suspensiones solicitadas por los demandantes, quienes presuntamente familiarizados con la cuestión litigiosa pues habían solicitado sentencia sumaria a su favor, y presentes en sala siete testigos entre ellos cinco demandantes, el 17 de junio de 1959, fecha por los propios demandantes sugerida para entrar a juicio, desatendieron la conminación del juez ("Lo único que le pide el Tribunal al compañero Coll es que comience el caso." (T.E. pág. 63)) con la expresión de su abogado de no hallarse preparado. Recurrieron ante nos los demandantes, y este Tribunal por sentencia de 9 de marzo de 1962 anuló el auto de revisión expedido y confirmó la decisión de instancia aduciendo para ello cinco fundamentos, entre los cuales el 4° declara:

'si bien es cierto que los pleitos deben resolverse en sus méritos, no es menos cierto que una parte demandada tiene derecho a que se le libere de los perjuicios que causa—tanto materiales como espirituales—un prolongado litigio, y aún más, en asuntos que envuelven su reputación y honradez." *Sucn. Pagán Lozada* v. *Berríos Berdecía,* 84 D.P.R. 624, 627 (1962).

Veintidós años después de presentada la demanda[1] de los herederos de Pagán Lozada y dieciséis años después de resuelto el pleito en última instancia, durante el transcurso de los cuales el querellado ha continuado en el ejercicio de la

---

[1] Las actuaciones impugnadas en la demanda se remontan a los años 1947–49.

abogacía manteniendo una buena reputación, según lo acredita ante el Comisionado el testimonio del Juez Superior, Sr. Arturo Cintrón García, sin que la prueba recibida comprenda acto alguno de deshonestidad o inmoralidad en el ejercicio de la profesión, no se justifica la severidad del desaforo.

El querellado Sr. Rojas Flores fue admitido a la práctica de la profesión jurídica el 9 de julio de 1931, a la que se ha dedicado durante 47 años. Su expediente personal revela que tiene 72 años de edad. Para un abogado que al cabo de casi medio siglo de práctica conservando un buen nombre se enfrenta a cargos deshonrosos, la censura o reprobación de este Tribunal es tan grave sanción y tiene tanta fuerza de impacto en su consciencia profesional, como una suspensión por menor o mayor término.

Las conclusiones del Comisionado terminan exonerando al querellado de corrupción, al expresar que no aparece que éste se beneficiara de las operaciones y manejos del otro albacea. Todo cuanto en último análisis señala el Informe del Comisionado es que el querellado, ocupado en la práctica de la profesión, luego de aceptar el cargo de albacea conjuntamente con Rosado, delegó por completo en éste sus funciones de ejecutor testamentario, no intervino en la administración de los bienes hereditarios y mucho menos en la fiscalización de los actos de Rosado, (²) por lo que su conducta sólo puede tacharse de indolente y descuidada.

---

(²) Así tipifica su conducta el Comisionado en el párrafo Núm. 29 de su Informe, donde se expresa:

"El querellado no intervino en la propia y adecuada administración de los bienes de la Sucesión, ni exigió del co-albacea don Martín Rosado la rendición de cuentas e informes trimestrales al Tribunal competente sobre las gestiones del albaceazgo, toda vez que, como queda indicado, solamente rindió dos informes a requerimiento de la Sucesión ilegítima y luego de una orden del Tribunal al respecto. Sobre este particular el propio querellado al contestar la querella contesta lo siguiente:

'Con relación a las cuentas de las operaciones del albaceazgo, usted recuerda las fechas?

'Están unidas al expediente.

'Ustedes hicieron un solo informe?

Los propios cargos lo que imputan al querellado es conducta pasiva o incuria: Cargo I, (a) que no informó la existencia de un contrato de aparcería a favor del co-albacea Rosado; (b) ni hizo, ni obligó al co-albacea a practicar inventario a raíz de haber aceptado el cargo; y (c) no intervino "en la propia y adecuada administración de los bienes de la sucesión." Es alegación común a los apartados (a), (b) y (c) que la conducta de abstención del querellado contribuyó y provocó "la disipación del caudal hereditario en grave perjuicio de los intereses de la sucesión." De la prueba ante el Comisionado resultó que la única de estas actuaciones impropiamente caracterizada como de disipación del caudal lo fue el otorgamiento el 2 noviembre, 1949 de una escritura ante el Notario Sr. Ubaldo Aponte mediante la cual la viuda e hijos de Teclo Pagán vendieron tres fincas rústicas a Antonio Berríos Berdecía por precio global de $45,000 del que confesaron los vendedores haber recibido antes del acto la cantidad de $24,700 que "no habían sido pagados *antes del momento*(3) de otorgarse la escritura." Informe Comisionado, pág. 19. No estuvo presente el querellado Rojas Flores en el acto de otorgamiento de esta escritura que tuvo lugar en la casa del albacea Martín Rosado, ni hubo prueba de que él "tolerara" o aconsejara esta operación, como tampoco puede concluirse que se disiparon bienes de los herederos en ausencia de determinación sobre si el precio confesado como recibido se pagó o no días después del otorgamiento, como ocurre en no pocos negocios.

En el segundo cargo se atribuye al querellado haber hecho ante el Tribunal Superior aseveraciones falsas tanto en alegaciones escritas como orales. La grave imputación se reduce en la prueba a lo siguiente: (a) en un informe de albaceazgo

---

'Un solo informe. Ya usted verá como fue que se realizaron las operaciones. Yo no intervine en eso. Vamos a hacer clara mi posición. Yo no recibí nunca nada ni transé nada a nombre de ellos.' "

(3) No dice el Informe si el comprador Berríos pagó esos $24,700 en ocasión posterior.

omitió una casa que había sido objeto de cesión de derechos y acciones dos años antes mediante escritura autorizada por él; [4] (b) en dos informes se omitieron además la casa vivienda de Rosado y veinte casas de medianeros. Aparece que ambos informes fueron objetados y eventualmente corregidos; (c) que los albaceas en su informe valoraron en $55,000, tres fincas rústicas de los hijos del causante; y cuatro meses después cuando solicitaron autorización judicial para permutar su participación por una casa de su señora madre en Río Piedras, valoraron las dichas fincas en $64,507, una diferencia de $9,507 que aprovecha, y no daña, a los menores permutantes; (d) que habiéndose omitido en la petición la existencia de un crédito de $2,000 a favor de los hijos menores sobre la casa de su señora madre con la aprobación del fiscal y el juez se reajustó a $12,000 la valoración de la casa. Quedó injustificada la calificación de falsedad en las alegaciones que contiene el cargo, y más aún la imputación de que se perjudicó a los herederos. Se trata de errores de inadvertencia u olvido, así reconocidos por el Enjuiciamiento y las Reglas de Procedimiento Civil que autorizan su corrección por enmienda.

■ El tercero y último cargo cuestiona la capacidad del querellado para autorizar como Notario escrituras públicas que tenían por objeto bienes sujetos a su albaceazgo, intervención que el Procurador General estima vulnerante de la Sec. 8 de la Ley Notarial([5]) (4 L.P.R.A. sec. 1008) porque

---

[4] Con referencia a este inmueble, aparece el siguiente escolio a la pág. 22 del Informe del Comisionado: "En el segundo informe que rinden los albaceas en 27 de octubre de 1964 aparece una nota informando que esta casa se vendió, pero no informan la fecha."

[5] Sec. 1008. *Incapacidad por interés o parentesco*

"Ningún notario podrá autorizar contratos en que él intervenga como parte, que contenga disposición en su favor, o en que alguno de los otorgantes sea pariente suyo dentro del cuarto grado de consanguinidad o segundo de afinidad. Cuando un notario intervenga en el otorgamiento de escrituras que hayan de ser inscritas en un registro de la propiedad que esté a cargo de algún pariente suyo, dentro de los grados antes especifica-

en dichos documentos: (a) se enajenaron propiedades de menores, sin previa autorización judicial; (b) se expusieron hechos falsos; y (c) no se siguieron instrucciones del Tribunal. Determinó el Comisionado que: (a) no hubo tal enajenación faltando autorización judicial pues en el propio texto del documento público se difiere la segregación hasta que "el Tribunal de Distrito de Puerto Rico, Sección de Ponce, haya consentido en nombre de los menores"; (b) la alegación de falsedad concierne a las omisiones que hemos analizado bajo el segundo cargo y el Comisionado la descarta con la siguiente observación a la pág. 27: "Hemos examinado el historial de las transacciones que se llevaron a cabo y en las cuales el querellado actuó como notario después del 26 de febrero de 1947 en que éste acepta el cargo de albacea y hemos encontrado que otorgó como notario ocho escrituras y un pagaré. Hemos examinado los nueve (9) documentos y todos contienen información que a la luz de los hechos que rodean la misma es cierta a menos que se concluya que el hecho mismo de la transacción sea falso, para lo cual no tenemos base para formular la conclusión."

En cuanto al posible conflicto en la actuación del Notario autorizante, que es a la vez albacea y contador partidor, no hay prueba de que el querellado lo fuera a título universal con facultad dispositiva de los bienes de la herencia otorgada por el testador y aun si lo fuera, su actuación no está comprendida en la prohibición de la citada Sec. 8 ya que no fue parte en dichos contratos, ni contenían los mismos disposición a su favor.

La parte final (c) de este último cargo quedó reducida en su virtualidad de prueba a que el querellado no presentó prontamente al Registro de la Propiedad un documento público de permuta, autorizado por el Tribunal Superior en 1949, mediante el cual se transigió una reclamación de los hijos natu-

---

dos, el registrador de la propiedad vendrá obligado a inhibirse en la calificación del documento."

rales Pagán Avilés; como tampoco se registró una escritura de hipoteca constituida por la madre a favor de sus hijos menores de edad por $2,000, también mediando autorización judicial. En ninguno de los dos casos hubo perjuicio alguno para los menores en la tardanza en presentar al Registro.

Con esta prueba, no está justificado el Tribunal en alterar el reposo impuesto al litigio en *Pagán Lozada* v. *Berríos Berdecía,* supra.

El querellado nunca descargó a plenitud las obligaciones del cargo de albacea que libremente aceptó. Fue débil y descuidado al descansar en el co-albacea Martín Rosado y le faltó diligencia en el cumplimiento de deberes impuestos al ejecutor testamentario. Los treinta años transcurridos desde que el 16 de febrero de 1947 ante el Notario Sr. E. Arroyo Vivas juró el querellado su cargo de albacea, no enervan la severidad del Canon 38 de Etica en su austera admonición: "El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. . . . Por razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida privada como en el desempeño de su profesión, debe conducirse en forma digna y honorable." Ap. IX, C. 38.

■ La conducta descuidada del abogado, aun cuando no alcance proporciones de depravación, dentro de una profesión cuyo fundamento moral es tan complicado que se sustrae a la común percepción de la opinión pública, alimenta la crítica injusta y la difamación que en muchas ocasiones es aneja a los honores profesionales. Hay que evitar aun la mínima apariencia de corrupción que en el concepto vulgar invoque la sentencia de don Angel Ossorio, [6] Decano del Colegio de

---

[6] *El Alma de la Toga,* pág. 34, Séptima Edición, Buenos Aires, (1971).

Abogados de Madrid: "la mujer que vende su cuerpo puede ampararse en la protesta de su alma, mientras que el abogado vendería el alma para nutrir el cuerpo."

La buena reputación preservada por el querellado, no obstante este remoto e infortunado episodio en su vida profesional, detiene nuestra acción disciplinaria justamente en la reprobación y censura; más que de sus actos, de su inacción e incuria.

*Se archivará la querella.*

El Juez Asociado Señor Negrón García emitió opinión disidente.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.
San Juan, Puerto Rico, a 3 de octubre de 1978

Contra el abogado notario Leopoldo Rojas Flores el Procurador General de Puerto Rico formuló querella disciplinaria por alegadas actuaciones profesionales indebidas mientras se desempeñaba en el cargo de albacea testamentario de la Sucn. de Teclo Pagán Lozada. Previo los trámites de rigor, el Comisionado Especial Hon. Filiberto Santiago Rosario rindió su Informe. Los abogados de las partes fueron notificados, habiendo la representación del querellado presentado un Memorando, que en súplica solicita su exoneración y archivo.

En su Informe el Comisionado estimó probado lo siguiente:

*"Conclusiones de Hechos Generales*

1. Don Teclo Pagán Lozada, casado y con doce hijos menores de edad, seis de matrimonio y seis fuera de matrimonio, falleció en Aibonito, el día 15 de enero de 1947. Había otorgado testamento abierto dieciocho días antes de su muerte, el día 28 de diciembre de 1946, mientras se encontraba recluído en la clínica, instituyendo herederos a todos sus hijos menores y a la viuda en la cuota usufructuaria establecida por ley. (Exhibit #1 del querellante caso R-1780.)

2. Al morir don Teclo Pagán poseía, conjuntamente con su esposa, 774.33 cuerdas de terreno, vacas, bueyes, caballos y demás animales domésticos para la explotación agrícola.

3. Dispuso que *'las dos terceras partes del haber hereditario se distribuyeran por partes iguales entre los seis hijos legítimos y el tercio restante a distribuirse entre sus seis hijos naturales por igual,* luego de que se pagaran tres legados por $300.00 a cada una de sus tres hermanas, Inés, Leonarda y Cruz Pagán.' (Énfasis en el original.)

4. Nombró *albaceas* y *contadores partidores* por cinco años al querellado y al Sr. Martín Rosado para desempeñarlo mancomunadamente (véase la escritura de testamento abierto número 99, de 28 de diciembre de 1946, otorgada ante el notario Edmundo Arroyo Vivas—Exhibit número 1 del querellante).

5. Por Escritura Núm. 11, sobre acta de aceptación de cargo de albacea, otorgada el 16 de febrero de 1947 ante el notario Edmundo Arroyo Vivas, el querellado y don Martín Rosado aceptaron el cargo de albacea comprometiéndose cada uno, según la declaración jurada, *'a desempeñar dicho cargo y cumplir con todas las obligaciones legales que dicho cargo me impone, según mi leal saber y entender y así me ayude Dios.'* (Énfasis en el original.) (Exhibit #1 del querellante.)

6. El 26 de febrero de 1947, nueve días más tarde, comparecieron los albaceas representados por el Lcdo. Edmundo Arroyo Vivas ante la Sala de Guayama del anterior Tribunal de Distrito y solicitaron que el Tribunal les expidiera las cartas testamentarias correspondientes a los fines de ejercitar debidamente las funciones de albacea. El mismo día el Tribunal emitió resolución declarando con lugar la solicitud—caso civil R-1780—Exhibit número 1 del querellante. (Exhibit #1 del querellante.)

7. Dos años más tarde, en vista de que los albaceas no habían hecho inventario inicial, no habían rendido el informe de rigor, ni habían procedido a la liquidación de la Sociedad de Gananciales de don Teclo Pagán y esposa, ya disuelta por la muerte de éste, ni a la distribución del caudal hereditario, los hijos naturales representados por su madre, doña Juana Avilés, instaron un caso civil ante la anterior Sala de Guayama del Tribunal de Distrito—caso civil 2830, sobre autorización judicial. Dentro de ese caso el Tribunal ordenó a los albaceas que rindieran un informe en o antes del 25 de marzo de 1949, y el 24 de ese mismo mes y año el querellado radicó una solicitud de prórroga y soli-

citó que se le concediera hasta el 15 de abril de 1949 para rendir el informe. El Tribunal aprobó la solicitud inmediatamente.

8. El 14 de abril de 1949, dos años tres meses después de la muerte del causante, el querellado y el otro albacea, Sr. Martín Rosado, radicaron un 'Informe de los Bienes y de las Operaciones de la Sucesión de Teclo Pagán Lozada', haciendo constar que el finado, Sr. Teclo Pagán Lozada, había dejado entre sus bienes seis fincas rústicas con una extensión total de 774.33 cuerdas, desglosadas en la forma siguiente: (a) 303.54 cuerdas (finca Barrio Pulguillas, de Coamo); (b) 338.88 cuerdas (finca Barrio Asomante, de Aibonito); (c) 32.25 cuerdas (finca Barrio Asomante, de Aibonito); (d) 2.65 cuerdas (finca Barrio Asomante, de Aibonito); (e) 90.86 cuerdas (finca Barrio Botijas, de Orocovis); (f) 6.15 cuerdas (finca Barrio Botijas, de Orocovis).

Se enumera en el informe una relación de los bienes muebles o semovientes y que incluyen ganado y caballos, una cuenta corriente por $1,833.54 y varias cuentas a cobrar por $750.00. Los activos—fincas, bienes muebles semovientes, cuenta de banco y cuentas a cobrar—se estimaron en $64,083.54. Las deudas totalizaron $29,800.00 y el balance a 30 de marzo de 1947 se estimó en $34,283.54.

Se enumera en el informe las cantidades que el albacea Martín Rosado recibió de la Sucesión, por concepto de venta de ganado y frutos menores; las cantidades que el albacea Martín Rosado entregó a la viuda de don Teclo Pagán Lozada y a doña Juana Avilés, quien era la madre de los hijos naturales; las cantidades que fueron entregadas al querellado por los trámites judiciales relacionados con asuntos de la Sucesión de don Teclo Pagán Lozada y los gastos en que incurrió el albacea Martín Rosado en trámites relacionados con la Sucesión, abonos de hipotecas a los bancos, construcción de ranchos, etcétera. (Exhibit #1 del querellante caso R-1780.)

9. Mientras tanto se está litigando el caso R-1780 ante la misma Sala y en el cual el querellado y el señor Martín Rosado como peticionarios solicitaron la expedición de cartas testamentarias, y dentro del cual rindieron el informe de referencia dos años dos meses después de haberse expedido las cartas testamentarias.

10. El 18 de abril de 1962 el Tribunal Superior, Sala de Guayama, emitió resolución estableciendo que se rindiera el informe en o antes del día 10 de mayo a las 12:00 del mediodía,

cubriendo las cuentas completas y específicas del albaceazgo, conforme a las disposiciones de ley que rigen la materia.

11. El 2 y el 4 de mayo de 1962 el querellado y el otro albacea radicaron escritos alegando que el término del albaceazgo había vencido y por lo tanto había prescrito.

12. El 25 de febrero de 1963 el Hon. A. D. Marchand Paz emitió una resolución resolviendo que a la fecha en que se radicó la solicitud para que se rindiera el informe por los señores albaceas, éstos habían cesado como tales, y desestimó la solicitud.

13. Los promoventes recurrieron al Honorable Tribunal Supremo, que por sentencia de 10 de mayo de 1963 dejó sin efecto la resolución y devolvió el caso para la continuación de los procedimientos.

14. Revocada la sentencia y establecido que el término para rendir el informe no había prescrito, el querellado y el otro albacea radican el 27 de octubre de 1964 un informe cubriendo el estado de situación de los bienes del finado a la fecha de su fallecimiento. Este informe también fue rechazado por los miembros de la Sucesión, que por escrito de 7 de enero de 1965 radicaron ante el Tribunal numerosas objeciones. (Véase Exhibit #1 del querellante.)

15. El trámite procesal de este caso de cartas testamentarias, una vez devuelto el expediente por el Honorable Tribunal Supremo a la Sala de Guayama, continuó su curso bajo la atención del Hon. Alfonso L. García Martínez en la Sala de Guayama del Tribunal Superior.

16. Por resolución de 7 de diciembre de 1970 en este caso R-1780, que es la vista del incidente sobre cartas testamentarias, este magistrado dictó sentencia desaprobando las cuentas rendidas por los albaceas, les ordenó restituir los ingresos percibidos y no informados y dispuso que los albaceas respondieran a los demandantes por las consecuencias derivadas de las enajenaciones, resolviendo que estaban viciadas de nulidad.

17. El 31 de marzo de 1971 el querellado y el otro albacea, Sr. Martín Rosado, recurrieron al Honorable Tribunal Supremo en un recurso de revisión.

18. El 8 de septiembre de 1971 el Honorable Tribunal Supremo declaró no a lugar a la solicitud de revisión, y el 27 de septiembre y 13 de octubre de 1971 declaró no a lugar a mociones de reconsideración.

19. Como resultado de la confirmación de la sentencia:

(a) Se desaprobaron las cuentas rendidas por los albaceas testamentarios Leopoldo Rojas Flores y Martín Rosado.

(b) Se ordenó a los albaceas testamentarios restituir a los demandantes los ingresos percibidos y no informados, devengados durante la vigencia del albaceazgo y producto de los bienes relictos y que ascienden a la suma de $18,184.74.

(c) En adición a la restitución de ingresos mencionados en el segundo pronunciamiento, se dispuso que los albaceas responderían a los demandantes por las consecuencias derivadas de la enajenación, viciada de nulidad, según concluye, de sus participaciones en las tres fincas, ascendentes a seiscientos cuarenta y cinco cuerdas con siete céntimos (645.07 cuerdas): en los Barrios Pulguillas, de Coamo (303.54 cuerdas), Asomante, de Aibonito (338.88 cuerdas) y Asomante, de Aibonito (2.65 cuerdas).

20. Con motivo de la sentencia del Hon. Alfonso L. García Martínez la Sucesión de don Teclo Pagán Lozada radicó los siguientes casos en la Sala de Guayama del Tribunal Superior:

(a) 71-363, contra José Urrutia y Esther Betancourt, sobre reivindicación y cobro de frutos;

(b) 71-364, contra Javier Antolín Rivera y su esposa, sobre reivindicación y cobro de frutos;

(c) 71-365, contra Rafael Falcón y su esposa, sobre reivindicación y cobro de frutos;

(d) 71-366, contra Agustín Colón Matos y su esposa, sobre reivindicación y cobro de frutos;

(e) 71-367, contra Teodoro Antolín y Carmen Rivera Suárez, sobre reivindicación y cobro de frutos;

(f) 71-1274, contra Martín Rosado y Leopoldo Rojas Flores, sobre acción civil—daños y perjuicios y cobro de frutos— (este caso fue trasladado a la Sala de Ponce del Tribunal Superior).

21. Es parte de la historia procesal de este caso el trámite del caso de Sucesión de Teclo Pagán Lozada v. Antonio Berríos Berdecía, Leopoldo Rojas y Martín Rosado, sobre nulidad, reivindicación, cobro de dinero y daños y perjuicios que se inició el 17 de septiembre de 1956, el cual fue resuelto el 30 de junio de 1959, en cuya sentencia el Hon. Angel D. Marchand Paz desestimó la demanda bajo el fundamento de que la parte actora no estaba preparada para ventilar el caso, a pesar de las oportunidades,

según concluye, que le había concedido el Tribunal. La parte demandante recurrió al Honorable Tribunal Supremo, que por resolución de 9 de marzo de 1962—84 D.P.R. 624—confirmó la sentencia dictada por el Tribunal Superior, Sala de Guayama. En este caso la Sucesión, tanto legítima como natural, de don Teclo Pagán Lozada reclamaron de los albaceas y sus respectivas esposas y de don Antonio Berríos Berdecía, uno de los adquirentes de una de las fincas, e invocaron la nulidad de los actos, la reivindicación de los bienes, cobro de dinero y daños y perjuicios.

22. Como resultado de haberse confirmado la sentencia del Hon. Angel D. Marchand Paz desestimando la demanda en todas sus partes no fue posible adjudicar la demanda en sus méritos, que reclamaba la restitución de las seis (6) fincas a los demandantes, $60,000 por concepto de frutos y $100,000 por daños y perjuicios.

Esta querella se origina a iniciativa propia del Honorable Tribunal Supremo, tomando como base las determinaciones de hechos y sentencia dictada por el Hon. Alfonso L. García Martínez.

Luego de examinada la prueba testifical y la voluminosa prueba documental hemos formulado las siguientes:

### Conclusiones de Hechos Adicionales Particulares a Cada Cargo

Para una mayor claridad en su exposición copiamos a continuación el texto de cada cargo y las conclusiones correspondientes que hemos hecho luego de analizar toda la prueba.

La querella radicada por el Procurador General alegó lo siguiente:

'PRIMERO: El querellado, Leopoldo Rojas Flores, siendo abogado, y habiendo aceptado voluntariamente, con la correspondiente autorización judicial, la gestión de contador partidor y albacea testamentario mancomunado con Don Martín Rosado de los bienes relictos de Don Teclo Pagán Lozada, actuó negligentemente al no tomar las precauciones necesarias para la conservación y custodia de dichos bienes, contrario a sus deberes y obligaciones, realizando y/o permitiendo las siguientes actuaciones que contribuyeron y provocaron la disipación del caudal hereditario en grave perjuicio de los

intereses de la sucesión del mencionado Don Teclo Pagán Lozada:

a. Habiendo Don Teclo Pagán Lozada, tres días antes de su fallecimiento, otorgado ante el querellado un contrato de aparcería a favor del otro albacea, Don Martín Rosado sobre una finca del caudal sucesoral, no informó al tribunal competente sobre la existencia de dicho contrato; no lo inscribió ni procuró que fuera inscrito en el Registro de la Propiedad; ni exigió al co-albacea que rindiera los informes anuales sobre aparcería según se obligó por los términos del contrato.

b. No informó, ni gestionó que el co-albacea Don Martín Rosado informara al tribunal competente, que hubieren practicado inventario inicial alguno cuando asumió el cargo de albacea y contador partidor.

c. No intervino en la propia y adecuada administración de los bienes de la sucesión, habiendo tolerado actos de disipación del caudal por parte del co-albacea Don Martín Rosado ni exigió de éste la rendición de cuentas e informes trimestrales al tribunal competente sobre las gestiones del albaceazgo, todo ello a sabiendas de los riesgos y dificultades a que estaban abocados los intereses de la sucesión.'

Este cargo fue contestado por el querellado en la forma siguiente:

'Primero: Con respecto a este primer cargo y admitiendo el hecho de su nombramiento y aceptación, niega que realizara o permitiera realizar a sabiendas, actos que contribuyeran y provocaran la dilapidación del caudal hereditario, y en cuanto a las imputaciones específicas:

a) Acepta la omisión de consignar la existencia del contrato de aparcería, aunque la finca sobre la que se estableció sí fue inventariada y alega que la inscripción de dicho contrato en el Registro de la Propiedad, aparte de no ser obligatoria, no le daba ni le restaba eficacia al contrato, y por otra parte es un hecho cierto que el albacea Martín Rosado daba cuenta del negocio periódicamente a la Sucesión.

b) El albacea Martín Rosado tenía en su poder toda la administración del caudal relicto de don Teclo Pagán Lozada, por lo que no era posible al querellado practicar el inventario, aunque sí instruyó al expresado albacea para que lo hiciera.

c) El hecho de que el querellado por sus múltiples ocupaciones y las circunstancias de distancia y otras dificultades se viera impedido prácticamente de la administración de los bienes del caudal, no quiere decir que tolerara los actos de disipación del caudal que pudiera llevar a cabo el otro albacea, no estimando el querellado que pudiera legalmente, por no estar entre sus facultades y deberes, exigir la rendición de cuentas del albacea que había tomado las riendas de la administración del caudal, considerando por otra parte que esa supervisión corresponde a los herederos y en todo caso al Tribunal.'

De la voluminosa prueba documental que hemos estudiado alrededor de este primer cargo hemos formulado las siguientes conclusiones:

23. Al morir don Teclo Pagán Lozada el 15 de enero de 1947 estaba vigente un contrato de aparcería que éste había formalizado con don Martín Ròsado por escritura pública ante el propio querellado—Núm. 7 de 12 de enero de 1947, tres días antes de aquél morir—. Este contrato cubría seiscientos cuarenta y tres cuerdas con treinta y siete céntimos (643.37) de terreno y el término de duración era por diez (10) años a partir de la fecha de otorgamiento y prorrogable por cinco (5) años adicionales. Existía entre don Teclo y don Martín una relación estrecha de negocios, según se desprende de los numerosos documentos y transacciones en autos. Ocho años atrás y por Escritura Núm. 98, sobre aparcería, otorgada ante el propio querellado el 26 de agosto de 1939, don Teclo Pagán Lozada había formalizado otro contrato de aparcería con don Martín Rosado cubriendo tres fincas con una extensión de 198 cuerdas ubicadas todas en el Barrio Gato, de Orocovis. Este contrato especificaba una vigencia de cinco años a partir de la fecha de su otorgamiento y prorrogable por cinco años adicionales, a discreción y conveniencia de los otorgantes.

24. Establecido que al morir don Teclo Pagán dejó 774 cuerdas de terreno y otros bienes muebles y semovientes y una viuda y doce hijos todos menores—entre ellos seis menores hijos fuera de matrimonio—la condición de aparcero de 643.37 de las 774 cuerdas de terreno y al mismo tiempo la condición de *albacea* y *contador partidor* presentaba un claro conflicto de intereses. Pero más dramático aún es el hecho de que don Teclo Pagán Lozada murió tres días después de otorgarse este contrato, por

lo que inferimos que no hubo tiempo ni de preparar el inventario inicial de los bienes bajo el contrato de aparcería.

25. El Código Civil en su Artículo 1469 establece que el arrendamiento por aparcería de tierras de labor, ganado de cría o establecimientos fabriles e industriales, se regirá por las disposiciones relativas al contrato de sociedad y por las estipulaciones de las partes, y en su defecto por la costumbre de la tierra. Se considera que el contrato de sociedad es uno de tipo consensual, bilateral y oneroso—Enciclopedia Jurídica Española, Tomo 28, Pag. 862—. Siendo así es forzoso concluir que el contrato de aparcería en este caso debió extinguirse con la muerte de don Teclo tres días después de otorgado, pero no fue así a juzgar por las numerosas transacciones que el aparcero llevó a cabo y por el tiempo que se extendieron sus gestiones.

26. Aceptado por el querellado el hecho del nombramiento y aceptación del cargo de albacea—mancomunado—debemos establecer con claridad a qué se obligó para poder determinar su responsabilidad. En la página 13 de la escritura de aceptación del cargo de albacea—affidavit #1631—que está copiada literalmente el querellado se obliga y compromete a 'aceptar el cargo de albacea con todas las implicaciones del mismo y que *"me comprometo a desempeñar dicho cargo y cumplir con todas las obligaciones legales que dicho cargo me impone, según mi leal saber y entender y así me ayude Dios"*.' (Énfasis en el original.)

27. Del informe que rindió el querellado el 14 de abril de 1949 *se desprende que éste no informó la existencia y extensión del contrato de aparcería; sin embargo, del contenido del mismo se desprende que el aparcero estaba en funciones. Es un hecho aceptado por el propio querellado que éste no informó al Tribunal competente sobre la existencia de dicho contrato. También aceptó que tampoco lo inscribió ni procuró que fuera inscrito en el Registro de la Propiedad, ni exigió al co-albacea que rindiera los informes anuales sobre aparcería, según se obligó por los términos del contrato.* (Bastardillas nuestras.)

28. El querellado no informó ni gestionó que el co-albacea don Martín Rosado informara al Tribunal competente que hubieran practicado inventario inicial alguno cuando asumió el cargo de albacea y contador partidor. Los únicos informes que rinde el querellado son el de 14 de abril de 1949, que se radicó en el caso R-1780 de la Sala de Guayama del Tribunal Superior

y otro informe de fecha 27 de octubre de 1964, también dentro del caso R-1780 (cartas testamentarias).

29. El querellado no intervino en la propia y adecuada administración de los bienes de la Sucesión, ni exigió del co-albacea don Martín Rosado la rendición de cuentas e informes trimestrales al Tribunal competente sobre las gestiones del albaceazgo, toda vez que, como queda indicado, solamente rindió dos informes a requerimiento de la Sucesión ilegítima y luego de una orden del Tribunal al respecto. Sobre este particular el propio querellado al contestar la querella contesta lo siguiente:

'Con relación a las cuentas de las operaciones del albaceazgo, usted recuerda las fechas?

Están unidas al expediente.

Ustedes hicieron un sólo informe?

Un sólo informe. Ya usted verá como fue que se realizaron las operaciones. Yo no intervine en eso. Vamos a hacer clara mi posición. Yo no recibí nunca nada ni transé nada a nombre de ellos.

Los querellantes afirman que dichas cuentas no se radicaron dentro del plazo fijado por ley.

No se radicaron porque los bienes estaban sujetos a una aparcería. Quiero decirle que en estos casos nunca, nunca fuimos administradores, sino albaceas.'

(Véase págs. 13 y 14, Exhibit #15 del querellante.)

. . . . . . . .

'A raíz de hacerse cargo de los bienes, hubo algún inventario?

Nosotros nunca nos hicimos cargo de los bienes porque estaban sujetos a aparcería.

Nunca se hizo un inventario?

Después se hizo.'

30. *La intervención del querellado como abogado y notario en contratos y transacciones en que estuvo envuelta la Sucesión de don Teclo Pagán Lozada revela que en todo momento estuvo al tanto y enterado del manejo por el otro albacea de los bienes de la Sucesión.* (Bastardillas nuestras.)

31. En lo relativo al apartado (c) del primer cargo en el sentido de que el querellado toleró actos de disipación del caudal por parte del albacea don Martín Rosado, al examinar la prueba presentada ante el Hon. Alfonso L. García Martínez, en el caso

sobre cartas testamentarias, formuló las siguientes conclusiones que fueron confirmadas por el Honorable Tribunal Supremo al declarar no ha lugar al recurso de revisión:

'20—Por escritura pública #141 ante el Notario Público Ubaldo Aponte con fecha 2 de noviembre de 1949, doña Marcelina Pagán y los menores emancipados, con el consentimiento de la madre, vendieron las fincas (A), (B) y (D) antes relacionadas, estando la (D) libre de gravámenes, a don Antonio Berríos Berdecía por la suma de $45,000.00, de la cual confesaban haber recibido con anterioridad al acto la suma de $27,306.00,(*) señalándose a las referidas fincas un valor de $24,700.00, $20,000.00 y $300.00 respectivamente.

Esta escritura se firmó en la casa de Martín Rosado, albacea de la sucesión. Según el testimonio oral del heredero, Lcdo. Alberto Pagán Pagán, ni él ni su madre o hermana recibieron dinero alguno en concepto de precio de compraventa. *Quedó probado que esos $24,700.00 no habían sido pagados antes del momento de otorgarse la escritura, a pesar de que así se hizo constar en la misma.* Véase la deposición tomada a Berríos Berdecía en el caso 56-382 de la Sucn. Teclo Pagán V Berríos Berdecía, Leopoldo Rojas y Martín Rosado.' (Énfasis en el original.)

.    .    .    .    .    .    .    .    .

'25—Al año de don Antonio Berríos Berdecía haber comprado dichas tres fincas las vendió, fiadas, al albacea Martín Rosado, con fecha 29 de noviembre de 1950, por precio de $40,000.00, según el testimonio del propio Martín Rosado en este caso. La venta de estas fincas a Martín Rosado se efectuó cuando aún estaba en todo su vigor el albaceazgo. Después, según ese mismo testimonio, Martín Rosado vendió parte de las fincas en $85,000.00 a José Urrutia, de Río Piedras: otra parte de 150 cuerdas a Rafael Falcón en $28,000 y 27 cuerdas a Agustín Colón en $7,000.'

32. El 26 de diciembre de 1972 el Tribunal Superior, Sala de Guayama resolvió el caso Sucesión de Teclo Pagán Lozada y Su-

---

'(*)Véase que en esta transacción los menores emancipados que aparecían en claro conflicto de intereses con su madre no estuvieron representados por un defensor judicial, conforme lo establece el Artículo 237 del Código Civil, 31 L.P.R.A. sec. 915, según ha sido interpretado en el caso de Pabón v. Registrador, 1953, 75 D.P.R. 463.'

cesión de Marcelina Pagán v. José A. Urrutia y Esther Betancourt, y declaró con lugar una solicitud de sentencia sumaria radicada por los demandados, a quienes el Tribunal les reconoció el carácter de terceros hipotecarios protegidos por la fe registral, y declaró sin lugar una demanda sobre reivindicación y cobro de frutos. Al revocar la sentencia el Honorable Tribunal Supremo el 12 de mayo de 1975 establece lo siguiente:

'Aun interpretando restrictivamente la prohibición de los albaceas,([3]) la aceptación de tal dictamen frustraría los propósitos de la ley pues permitiría la adquisición de un albacea por medio de un intermediario. Bastaría con la venta por los herederos a un tercero para que terminase el albaceazgo y quedase el albacea facultado para, obviada así la citada incapacidad legal, adquirir los bienes previamente confiados a su cargo. Nótese que el término del albaceazgo era por cinco (5) años([4]) y en ausencia de que el Registro revelara que éste había terminado su encomienda a satisfacción de los herederos y del tribunal, tal circunstancia era suficiente para poner sobre aviso a un ulterior adquirente respecto a posibles irregularidades cuando la propiedad es adquirida por el albacea durante su incumbencia directa o indirectamente; en particular habida cuenta de las cantidades envueltas demostrativas de que al albacea le fue vendida la propiedad por una cantidad menor ($40,000.00) a la invertida por su vendedor ($45,000.00) y cuyo costo original al causante fue de $56,000.00.'

El segundo cargo imputa al querellado lo siguiente:

'SEGUNDO: El querellado, Leopoldo Rojas Flores, radicó escritos y presentó alegaciones orales ante el Tribunal Superior, Sala de Guayama, que contenían aseveraciones que el querellado sabía o debía saber eran falsas y que tendían a inducir al tribunal a cometer errores en perjuicio de la sucesión que administraba.'

---

'([3]) Véase: *Piazza* v. *Piazza*, 83 D.P.R. 414, 424 (1961).'

'([4]) Conforme al Art. 832 (31 L.P.R.A. sec. 2529) de nuestro Código Civil, el albaceazgo termina con la muerte, imposibilidad, renuncia o remoción del albacea y por el transcurso del tiempo señalado por el testador. En adición se reconoce también como causa, el cumplimiento fiel del encargo culminando con la rendición y aprobación de cuentas. Puig Fernol, *El Albaceazgo*, págs. 260-261, 275-276 (1967).'

Al contestar este cargo el querellado informó lo siguiente:

'SEGUNDO: Se niega este cargo por la forma en que está redactado y por no ajustarse a la realidad de los hechos a que alude, pues todas las gestiones ante el Tribunal Superior de Guayama se hicieron por el abogado de la Sucesión, Lcdo. Ubaldo Aponte y a iniciativa de los mismos herederos, interviniendo en todos esos casos, por su índole, el Hon. Fiscal de Distrito.'

De la prueba testifical y documental presentada hemos formulado las siguientes conclusiones de hecho sobre este cargo:

33. Al radicar su informe de los bienes y de las operaciones de la Sucesión de Teclo Pagán Lozada como albacea de esa Sucesión el 15 de abril de 1949 y al rendir su segundo informe el 27 de octubre de 1964,(*) *omitió incluir entre los bienes inmuebles la casa y solar perteneciente a la Sucesión y que estaba ubicada en la Calle Rius Rivera, de Aibonito.* Esta casa de dos plantas, techada de zinc, radicada en la Calle Rius Rivera, de Aibonito, de 25' 6" de frente por 70' de fondo fue comprada por don Teclo Pagán Lozada y su esposa por escritura de compraventa número 186, otorgada ante el querellado el 22 de diciembre de 1945, y que fue motivo del contrato de cesión de derechos y acciones por escritura número 84, ante el propio querellado, de fecha 7 de julio de 1947, habiendo ya fallecido don Teclo Pagán Lozada. Habiendo sido el notario autorizante en varias escrituras, no vemos cómo pueda haber escapado al conocimiento del querellado y del co-albacea la existencia de esa propiedad. (Bastardillas nuestras.)

34. En ambos informes el querellado no informó, además, la existencia de las propiedades que se enumeran en las objeciones al informe que radicó la Sucesión de don Teclo Pagán el 7 de enero de 1965 y que aparece notificado a los abogados del querellado, Lcdo. Luis Blanco Colón y Lcdo. Luis Domínguez Rovira, y al propio querellado, a sus respectivas direcciones. El valor estimado de estas propiedades, según el escrito de la Sucesión, es de $58,200, e incluye, además de la casa en la calle Rius Rivera de Aibonito, varias otras casas en el Barrio Asomante, casa vivienda ocupada por el otro albacea Sr. Martín Rosado, valo-

---

'(*)En el segundo informe que rinden los albaceas en 27 de octubre de 1964 aparece una nota informando que esta casa se vendió, pero no informan la fecha.'

rada en $7,000 por los miembros de la Sucesión, veinte (20) casas de medianeros, con un valor de $500 cada una, para un valor total de $10,000, y otras casas y cuentas por cobrar. Se informa, además, en este escrito que los albaceas cobraron cuentas por $8,198 a distintas personas y al propio Gobierno de Puerto Rico, que tenía rentada una casa que se dedicaba a escuela y que pagaba $36 mensuales. Del récord de los autos de este caso no aparece que los albaceas—incluyendo al querellado—hayan refutado estas objeciones. De las objeciones se desprende que las mismas cubrían siete (7) casas con un valor estimado por la Sucesión en $37,000 y veinte (20) casas de medianeros con un valor estimado también de $10,000, para un total estimado de $47,000. Es un hecho que la existencia de estos bienes es de fácil comprobación sobre el terreno.

35. El 9 de agosto de 1949 compareció el querellado y el coalbacea don Martín Rosado, en su carácter como tales, y la señora Marcelina Pagán, por sí y en representación como madre con patria potestad sobre sus hijos menores de edad Juana, Samuel, Martín y Octavio Pagán Pagán, y radicaron en la Sala del anterior Tribunal de Distrito de Guayama el caso civil R-3037, sobre autorización judicial, para permutar bienes de menores. En este caso la madre y los albaceas solicitaron del Tribunal autorización judicial para permutar la participación de $1/12$ avas partes que cada uno de los referidos menores tenían en las fincas 'a' (de 303.54 cuerdas), 'b' (de 338.88 cuerdas) y 'd' (de 2.65 cuerdas), por una casa en Río Piedras propiedad de la madre. En esta solicitud que se radica en el mes de agosto de 1949 se le da un valor a estas tres fincas de $64,507 (en la solicitud enmendada de 26 de septiembre de 1949 se le da un valor de $62,629) a base de $100 por cuerda; sin embargo, cuatro meses atrás, el 14 de abril de 1949, en el informe que de los bienes rindió el querellado conjuntamente con el otro albacea, le da un valor de $55,000, lo cual es $9,507 menos, a pesar de que solamente hay un corto lapso de cuatro meses entre ambos escritos. (Véase pág. 2 de la solicitud.) La solicitud original no proveyó para que los menores estuvieran protegidos por un defensor judicial.

36. En el escrito que se radicó en este caso se omitió informar al Tribunal que los menores tenían un crédito de $2,000 sobre la casa que sería objeto de la permuta. Tal hecho queda en descubierto con motivo de múltiples preguntas del fiscal al éste

intervenir en la vista del caso (véanse págs. 19-20-21 y 22 de la transcripción). El Juez que presidía exigió una enmienda escrita a la solicitud. Se decretó un receso y al terminar el mismo el abogado de los peticionarios solicitó se enmendara la petición inflando el valor de la casa de $10,000 a $12,000, para acomodar el crédito de los menores sobre la misma. Esto es así porque la enmienda se solicitó después del receso en cuestión de minutos, según lo revela el récord (pág. 22).

37. De la transcripción del récord, en este se desprende claramente que al momento de la vista de este caso la viuda no tiene dinero para saldarle la hipoteca al acreedor Sr. Antonio Berríos Berdecía (véase pág. 32, línea 23 y pág. 22, línea 17 de la transcripción). Tan es así que el propio defensor judicial designado de los menores lo acepta en su interrogatorio (véase pág. 34, línea 29). Del récord se desprende que la intención clara era llevar a cabo la transacción y más tarde el acreedor hipotecario cobraría su crédito de otros bienes, complicando la situación y poniendo en peligro los bienes de los menores.

38. Al ventilarse en el Tribunal este caso el Juez se percató de que la solicitud no provee para el nombramiento de un defensor judicial para los menores y ordena una enmienda por escrito y en el acto designa al Lcdo. Manuel Rivera. Del récord taquigráfico se desprende que no pudo compenetrarse de toda la situación. Tan es así que éste estaba bajo la impresión errónea de que se había efectuado una partición inicial de los bienes del finado (véase récord taquigráfico del caso, pág. 17, línea 27).

El tercer cargo radicado por el Procurador General alega lo siguiente:

'En violación a las disposiciones de la Ley Notarial, Sec. 8 (4 L.P.R.A., Sec. 1008) el querellado, Leopoldo Rojas Flores permitió que ante él se otorgaran varios instrumentos públicos en los cuales estaban envueltos bienes confiados a su gestión como albacea y contador partidor, y en los cuales:

a. Se dispuso de propiedades de menores sin la autorización previa del tribunal competente.

b. Se expusieron hechos que personalmente le constaban o debían constarle que no eran ciertos.

c. Se dejaron de cumplir instrucciones dictadas por el tribunal que autorizó la transacción.'

El querellado lo contestó alegando lo siguiente:

'TERCERO: Se niega todo el contenido de este cargo. El querellado en ningún momento dispuso de propiedad o permitió que se dispusiera de propiedad alguna de la Sucesión Pagán Lozada sin la previa autorización judicial ante el Tribunal Superior de Guayama y siempre se cumplió con todas las órdenes del Tribunal que autorizó las transacciones, previo trámite de ley, interviniendo el Lcdo. Ubaldo Aponte como abogado de la Sucesión.'

Luego de examinar toda la prueba testifical y documental relacionada con este cargo hemos formulado las siguientes conclusiones sobre el apartado (a):

39. El 11 de agosto de 1951 y ante el querellado como notario, (por escritura número 122 de esa fecha) doña Marcelina, sus dos hijos Aida y Alberto—ya emancipados y sus otros cuatro hijos otorgan una escritura de 'Cesión de Derechos y Acciones' de las participaciones que éstos tenían en una finca de 105.87 cuerdas en el Bo. Botijas de Orocovis, segregando y vendiendo 300 metros cuadrados por $200 a doña Felícita Rodríguez. En la escritura—exhibit 1 del querellante, se menciona que la viuda, sus dos hijos emancipados y sus otros cuatro hijos son dueños en común pro indiviso, ella en condominio de la mitad y los menores en condominio de una sexta parte cada uno (6) de la otra mitad de la finca mencionada.

40. En esta escritura la madre y los hijos convienen en segregar los 300 metros 'una vez que el Tribunal de Distrito de Puerto Rico, sección de Ponce, haya consentido en nombre de los menores', comprometiendo de esa forma la venta de la porción del inmueble sin que antes se hubiera determinado por el Tribunal y un defensor judicial la sabiduría de la transacción.

En lo relativo al apartado (b) de este tercer cargo, las únicas conclusiones sobre hechos que personalmente le constaban o debían constarle al querellado que no eran ciertos aparecen bajo las conclusiones bajo el segundo cargo—(33), (34), (35), (36), (37) y (38), páginas 22 a la 25 de este informe. Hemos examinado el historial de las transacciones que se llevaron a cabo y en las cuales el querellado actuó como notario después del 26 de febrero de 1947 en que éste acepta el cargo de albacea y hemos encontrado que otorgó como notario ocho escrituras y un pagaré. Hemos examinado los nueve (9) documentos y todos contienen información que a la luz de los hechos que rodean la misma es

cierta a menos que se concluya que el hecho mismo de la transacción sea falso, para lo cual no tenemos base para formular la conclusión.

Surge claro del historial que el querellado actuó como albacea y contador-partidor, notario en los nueve (9) documentos y asesor legal del co-albacea, de la viuda, de sus hijos y de los hijos de apellido Pagán Avilés a juzgar por los documentos que se otorgaron ante él, por sus intervenciones en los casos que se radicaron en el Tribunal y en que estuvo envuelta la Sucesión.

Con relación a la imputación que se hace en el apartado (c) de este cargo hemos formulado las siguientes conclusiones:

41. El 21 de agosto de 1947 se radica en la Sala de Guayama del anterior Tribunal de Distrito el caso R-1900, en que la madre de los niños legítimos solicita autorización del Tribunal para disponer de $2,000 pertenecientes a los menores de apellidos Pagán Pagán para pagar el plazo pendiente en la compraventa de la casa y solar a doña María Bauzá González que se hizo por escritura número 92, de 25 de julio de 1947 ante el propio querellado. El plazo vencía en septiembre de 1947, (Exhibit 1 del querellante).

42. El 8 de octubre de 1947, luego de la autorización del Tribunal y por escritura número 142 ante el querellado sobre hipoteca voluntaria, por la cantidad de $2,000, la madre de los menores Pagán Pagán constituye hipoteca por $2,000 a nombre de éstos para garantizar el pago de los $2,000 que ella utilizó para pagar el plazo de la casa y solar ya mencionada.

43. De la certificación que expidió el Registrador de San Juan, Sección II, revelando el historial registral de esta finca y casa, *se desprende que la mencionada hipoteca no fue presentada ni registrada como era obligación del querellado aunque no hubo una orden específica del Tribunal en ese sentido según los términos de la resolución.* (Bastardillas nuestras.)

44. El 27 de junio de 1949 el Hon. Angel D. Marchand Paz, de la Sala de Guayama del anterior Tribunal de Distrito, emitió una resolución autorizando la permuta de la sexta parte que los menores Pagán Avilés tenían en cinco fincas, por las 5/6 partes que en la finca 'c' de 32.25 cuerdas en el Bo. Asomante de Aibonito tenían los menores Pagán Pagán y por la mitad también que en dicha finca tenía doña Marcelina Pagán, quedando entonces los menores Pagán Avilés dueños absolutos de la totalidad de la finca de 32.25 cuerdas y quedando también doña Marcelina

Pagán y sus seis hijos de apellidos Pagán Pagán dueños en absoluto de la totalidad de las siguientes fincas:

(a) Finca de 303.54 cuerdas en Barrio Pulguillas de Coamo.

(b) Finca de 338.88 cuerdas en el Bo. Asomante de Aibonito.

(d) Finca de 2.65 cuerdas en el Barrio Asomante de Aibonito.

(e) Finca de 90.88 cuerdas en el Barrio Botijas de Orocovis.

(f) Finca de 6.15 cuerdas en el Barrio Botijas de Orocovis.

La idea de esta permuta era resolver las reclamaciones de los menores Pagán Avilés que ya habían instado un caso para reclamar lo que les pertenecía.

45. Al examinar la certificación del Registro de la Propiedad, sección de Guayama, de fecha 18 de noviembre de 1959, conteniendo el historial registral de esta finca de 32.25 cuerdas diez años después de esta transacción, aparece que el dominio de la finca por los menores Pagán Avilés no se registró en el Registro de la Propiedad. En la certificación de 10 de febrero de 1949 en que aparecen tres fincas se incluye la finca de 32.25 cuerdas como propiedad de la viuda, sus hijos y los seis menores Pagán Avilés.

De las anteriores conclusiones específicas hemos formulado la siguiente conclusión general:

46. En vista de que la Sucesión del finado don Teclo Pagán Lozada estaba compuesta de la viuda y seis menores de apellidos Pagán Pagán y seis menores de apellidos Pagán Avilés, era obligación del querellado preparar un inventario y evalúo inicial de los bienes, computar las deudas, solicitar del Tribunal el nombramiento de defensores judiciales para los dos grupos de menores para representar a cada grupo de menores en todos y cada uno de los actos y contratos relacionados con los bienes, liquidar la Sociedad de Gananciales y rendir un informe al Tribunal, y finalmente adjudicar a cada uno lo que le correspondía. El querellado comenzó a realizar y a tolerar permutas, ventas, préstamos e hipotecas de los bienes sin tomar las precauciones necesarias y establecer los mecanismos que conocía como abogado para asegurar la mejor administración de los bienes. *Sin embargo, no hay prueba en el sentido de que el querellado se haya beneficiado económicamente.*" (Bastardillas nuestras.)

Una de las características esenciales que tradicionalmente proyecta el ejercicio de la profesión de abogado es de confianza en el desempeño de sus deberes y aquellos que incidental, pero voluntariamente, asume. Ante la comunidad, sus clientes y tribunales representa la figura principal mediante la cual se desenvuelven un sinnúmero de transacciones y se canalizan judicialmente innumerables remedios en ley. El preámbulo del Código de Ética subraya la necesidad de que el abogado en toda gestión profesional se rija por los principios básicos éticos establecidos ya que su función afecta de manera sustancial muchos aspectos principales de la vida moderna. Cuando éste acepta una encomienda que puede configir con su profesión, se le exige el mayor de los escrúpulos. La negligencia del querellado como albacea, su omisión de suplir en los trámites judiciales hechos y datos de importancia respecto a bienes bajo su encomienda; y su actuación como notario en transacciones relacionadas con bienes sujetos al albaceazgo, constituyen graves faltas[1] que a mi juicio ameritarían la suspensión del ejercicio de la abogacía.

Sin embargo, la conclusión del Comisionado en el sentido de que el querellado no se benefició económicamente —en virtud de los hechos demostrados— le favorece. Ello no obstante, sería materia para atemperar el rigor de la sanción disciplinaria antes expresada y nunca el archivo de la querella. El convencimiento de lo expuesto, me obliga lamentablemente a disentir de la decisión adoptada por el Tribunal.

---

[1] Véase: Preámbulo; Canon 1 y Canon 35 vigentes.