EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re:<br><br>    Joaquín Peña Peña | Querella<br><br>2001 TSPR 49 |

Número del Caso: CP-1994-800

Fecha: 27/marzo/2001

Oficina del Procurador General:

Lcda. Yvonne Casanova Pelosi
Procuradora General Auxiliar

Abogado de la Parte Querellada:

Lcdo. Arturo Negrón García

Materia: Conducta Profesional
(La suspensión es efectiva a partir del 29 de marzo de 2001, fecha en que se le notificó al abogado el Per Curiam y Sentencia)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re

    Joaquín Peña Peña                    CP-1994-800

**PER CURIAM**

San Juan, Puerto Rico, a 27 de marzo de 2001.

Durante la incumbencia del abogado Joaquín Peña Peña como miembro del Senado de Puerto Rico, éste fue acusado por el delito de apropiación ilegal de fondos públicos; ante tal cargo, hizo alegación de culpabilidad por el delito menos grave de omisión en el cumplimiento del deber. La evidencia presentada en vista ante un Comisionado Especial designado por este Tribunal demuestra que el licenciado Peña Peña incurrió en la práctica de "empleados fantasmas", deshonrando su posición como Senador y malversando los fondos públicos que habían sido asignados a su oficina.

En virtud de nuestra facultad inherente para reglamentar el ejercicio de la abogacía, procedemos a disciplinar a este abogado. Ello tras concluir que el licenciado Peña Peña actuó en contravención a las normas de conducta profesional que debe observar celosamente todo abogado.

I

El 10 de abril de 1992, la Contralor de Puerto Rico, mediante carta jurada ante notario público, refirió al Departamento de Justicia los hallazgos de una auditoría de las operaciones fiscales del Senado de Puerto Rico para el período del 1 de agosto de 1982 al 30 de junio de 1990. Dicha auditoría examinó las operaciones relacionadas con el reclutamiento y administración del personal asignado al entonces Senador Joaquín Peña Peña.[1] Realizada la investigación correspondiente por parte de la Oficina de Asuntos del Contralor del Departamento de Justicia, el Fiscal Especial Independiente y el Ministerio Público presentaron denuncias contra el Senador Peña Peña por apropiación ilegal agravada en violación del artículo 166(a) del Código Penal de Puerto Rico.[2] Específicamente, se le

---

[1]El licenciado Joaquín Peña Peña fue admitido al ejercicio de la abogacía el 9 de enero de 1970 y al de la notaría el 17 de febrero de 1970. Se desempeñó como Senador desde el 1985 al 1992.

[2]**Dispone el artículo 165 del Código Penal de Puerto Rico:**

> "Toda persona que ilegalmente se apropiare sin violencia ni intimidación de bienes muebles, pertenecientes a otra persona, será sancionada con pena de reclusión por un término que no excederá de seis (6) meses, multa que no excederá de quinientos (500) dólares, pena de restitución, o cualquier combinación de éstas, a discreción del Tribunal." 33 L.P.R.A. sec. 4271.

continúa...

[2]...continuación

**Dispone, a su vez, el artículo 166(a):**

> "Será sancionada con pena de reclusión por un término fijo de diez (10) años, toda persona que cometiere el delito previsto en el Artículo anterior [165] con la concurrencia de cualquiera de las siguientes circunstancias:
>
> > (a) Apropiándose de bienes o fondos públicos pertenecientes al Gobierno del Estado Libre Asociado de Puerto Rico, los municipios, agencias, corporaciones públicas, subdivisiones políticas y demás dependencias públicas o a entidades privadas de

imputó el haberse apropiado ilegalmente de fondos públicos al gestionar el nombramiento de ciertos empleados con el fin de que éstos recibieron sueldos, sin que cumplieran con las obligaciones de su cargo.

Luego de varios trámites, se produjo un acuerdo entre el Departamento de Justicia y el abogado acusado, mediante el cual el Ministerio Público reclasificó los delitos imputados del delito de apropiación ilegal en su modalidad grave, al delito menos grave de omisión en el cumplimiento del deber, según lo dispuesto por el artículo 214 del Código Penal.[3] El licenciado Peña Peña hizo alegación de culpabilidad por violación al aludido artículo 214. El 28 de enero de 1994, el Tribunal de instancia aceptó dichas alegaciones y dictó Sentencia imponiéndole como pena una multa de cien dólares ($100.00).

Así las cosas, al ser el Senador Peña Peña licenciado para practicar la profesión legal en Puerto Rico, el 9 de mayo de 1994, el Procurador General presentó un informe ante este Tribunal, a los fines de que tomáramos conocimiento de los referidos sucesos. Por su parte, el licenciado Peña Peña contestó dicho informe, cuestionando la credibilidad del mismo. Por consiguiente, el 10 de octubre de 1994, emitimos Resolución ordenándole al Procurador General que presentara formalmente una querella ante este Tribunal en contra del licenciado.

En cumplimiento de dicha orden, el 4 de noviembre de 1994, el Procurador General radicó la querella de epígrafe imputando los siguientes cargos contra el licenciado Peña Peña:

CARGO I

El licenciado Joaquín Peña Peña violó el Canon 38 de Etica Profesional el cual obliga a todo abogado a preservar el honor y la dignidad de la profesión de la abogacía y de desempeñarse en forma digna y honorable, tanto en su vida profesional como en su vida privada.

CARGO II

El licenciado Joaquín Peña Peña incurrió en conducta constitutiva de depravación moral lo cual lo incapacita y lo hace indigno de ostentar el título de abogado según lo dispuso este Ilustre Foro en Colegio de Abogados v. Barney, 109 D.P.R. 845, (1980).

---

beneficencia; [...]" 33 L.P.R.A. sec. 4272 (a)

[3]Dispone el artículo 214 el Código Penal de Puerto Rico:
"Toda omisión voluntaria en el cumplimiento de un deber impuesto por la ley o reglamento a un funcionario o empleado público, o persona que desempeñare algún cargo de confianza o empleo público de no existir alguna disposición señalando la pena correspondiente a dicha omisión, se penará con reclusión que no excederá de seis (6) meses o multa que no excederá de quinientos (500) dólares o ambas penas a discreción del tribunal." 33 L.P.R.A. sec. 4365.

En apoyo de los cargos presentados, el Procurador General alegó que el Senador Joaquín Peña Peña había nombrado a las señoras Benigna Montañez Agrinsoni, Carmen L. Cruz Rosa y Lilliam Carrasquillo Flores como sus ayudantes, para ejercer esa función en la oficina de éste, y que las mismas habían recibido pagos por concepto de sueldos y beneficios marginales ascendentes a $39,464.01, $29,363.54 y $21,212.55, respectivamente. Ello sin que hubiesen realizado dichas labores.

El querellado presentó su contestación a la querella el 10 de enero de 1995. Negó la totalidad de los cargos imputados. Específicamente, adujo que los pagos realizados a sus ayudantes habían sido hechos legalmente, ya que dichas personas habían rendido sus labores con suma diligencia y así lo habían reportado en sus informes; que no existía prueba fehaciente de lo alegado por el Procurador General, ya que todas las imputaciones eran de naturaleza circunstancial; que el procedimiento utilizado para llevar a cabo la investigación había sido uno selectivo y prejuiciado, que le hizo caso omiso a las declaraciones de los supervisores y de los testigos que conocían el trabajo de dichas empleadas; y que había hecho una alegación de conveniencia por una infracción menos grave al artículo 214 del Código Penal, supra, aunque era totalmente inocente de los cargos imputados por el Ministerio Público. Por último, el querellado alegó que el Departamento de Justicia y el Procurador General estaban impedidos de instar la acción disciplinaria en su contra, ya que fue el mismo Departamento de Justicia el que originalmente solicitó al tribunal de instancia la eliminación de los cargos en su contra; sostuvo que esa eliminación de cargos le prohibe al Departamento de Justicia la posterior presentación de una querella disciplinaria que versa sobre los mismos hechos.[4]

El 24 de febrero de 1995, mediante Resolución designamos como Comisionado Especial al licenciado Abner Limardo. Este celebró vista para

---

[4]El querellado no tiene razón. Los procedimientos disciplinarios ante este Tribunal son independientes de las acciones legales, ya sean criminales o civiles, que emanen de la misma relación de hechos. Véanse In re Pagán Ayala, 117 D.P.R. 180, 187 (1986) (un acuerdo con el propósito de evitar que un cliente se querelle de la conducta de su abogado no impide el ejercicio de la jurisdicción disciplinaria del Tribunal Supremo); In re Soto López, 135 D.P.R. 642, 646 (1994) (el ejercicio de la jurisdicción disciplinaria del Tribunal Supremo no depende del resultado de un proceso criminal).

recibir la prueba testifical y documental presentada por ambas partes, así como el testimonio de los testigos presentados. A la luz de dicha prueba, el Comisionado rindió el correspondiente informe y lo presentó ante nos el 10 de agosto de 1995. Ambas partes comparecieron ante este Tribunal a exponer su posición respecto al referido informe. Quedando el caso sometido, procedemos a resolverlo.

II

La primera interrogante que nos ocupa en cuanto a la querella de epígrafe es si procede la suspensión del querellado según lo dispuesto por la sección 9 de la Ley de 11 de marzo de 1909, 4 L.P.R.A. sec. 735, que dispone:

> "El abogado que fuere culpable de engaño, conducta inmoral (malpractice), delito grave (felony) o delito menos grave (misdemeanor), en conexión con el ejercicio de su profesión o que fuere culpable de cualquier delito que implicare depravación moral, podrá ser suspendido o destituido de su profesión por la Corte Suprema de Puerto Rico. La persona que siendo abogado fuere convicta de un delito grave cometido en conexión con la práctica de su profesión o que implique depravación moral, cesará convicta que fuere, de ser abogado o de ser competente para la práctica de su profesión. A la presentación de una copia certificada de la sentencia dictada a la Corte Suprema, el nombre de la persona convicta será borrado, por orden de la Corte, del registro de abogados. Al ser revocada dicha sentencia, o mediante el perdón del Presidente de los Estados Unidos o del Gobernador de Puerto Rico, la Corte Suprema estará facultada para dejar sin efecto o modificar la orden de suspensión."

La Asamblea Legislativa claramente indicó que una suspensión de las funciones de un abogado, al amparo de este estatuto, procede si el mismo fue convicto de un delito grave. El querellado de epígrafe nunca fue convicto del delito grave que originalmente se le imputó, sino que presentó alegación de culpabilidad por un delito menos grave. El estatuto señala que, en estas circunstancias, sólo procede la suspensión si el delito fue cometido en relación a sus funciones como abogado. En este contexto, tampoco le aplica esta Ley al querellado, pues su conducta ilegal fue cometida mientras se desempeñada como Senador del Estado Libre Asociado y no como parte del ejercicio de la practica de la abogacía. Véase Colegio de Abogados v. Barney, supra. Tampoco podemos concluir que omisión en el cumplimiento del deber bajo el Art. 214, supra, del Código Penal, constituye, per se, un delito menos grave que implique depravación moral.

III

Lo expuesto en el acápite anterior, sin embargo, no dispone del asunto ante nuestra consideración. No obstante la disposición legal transcrita, hemos resuelto reiteradamente que la separación del ejercicio de la abogacía, al igual

que la admisión a ese ejercicio, es facultad inherente a este Tribunal. Véase Metropolitana de Préstamos v. López de Victoria, 141 D.P.R. 844 (1996); K-Mart Corp. v. Walgreens of Puerto Rico, Inc, 121 D.P.R. 633 (1988); In re Freites Mont, 117 D.P.R. 11 (1986); In re Liceaga, 82 D.P.R. 252, 255 (1961); In re Pagán, 71 D.P.R. 761, 763 (1950); In re Abella, 67 D.P.R. 229, 238 (1947); e In re González Blanes, 65 D.P.R. 381, 390-391 (1945). Además, en Colegio de Abogados de P.R. v. Barney, supra, expresamos que: "[s]iendo inherente tal facultad, podemos ordenar la separación de un abogado por motivos distintos de aquellos que para el desaforo ha decretado por ley la Asamblea Legislativa. La causa no tiene que ser necesariamente de origen legislativo." Véase, además, In re Liceaga, supra, a la pág. 255; In re González Blanes, supra, a la pág. 391; e In re Tormes, 30 D.P.R. 267, 268-269 (1922). Hemos suspendido y disciplinado, en múltiples ocasiones, a abogados que incumplen los Cánones de Etica que rigen la profesión de abogado. Véase In re Vargas Soto, 108 D.P.R. 490 (1979); In re Clavell Ruiz, 108 D.P.R. 259 (1978); In re Cardona Vázquez, 108 D.P.R. 6 (1978); In re Rojas Flores, 107 D.P.R. 564 (1978); In re Pagán Hernández, 105 D.P.R. 796 (1977); In re Cortés Ostolaza, 103 D.P.R. 72 (1974); In re Segarra, 102 D.P.R. 590 (1974); In re Coll Pujols, 102 D.P.R. 313 (1974); In re Guzmán, 82 D.P.R. 235 (1961); e In re Cruz Disdier, 70 D.P.R. 453 (1949).[5]

Hemos resuelto, además, que si se demuestra que la conducta del abogado no le hace digno de ser miembro de este foro, podemos ejercer nuestra facultad de desaforo aunque las actuaciones del abogado hayan surgido por causas no relacionadas con el ejercicio de su profesión, pues basta que tales actuaciones afecten las condiciones morales del querellado. In re Rivera Cintrón, 114 D.P.R. 481, 491 (1983); Colegio de Abogados de P.R. v. Barney, supra; 845 (1980); In re Liceaga, supra, págs. 255-256; In re Abella, supra, pág. 238; e In re Tormes, supra, pág. 270.

Es la facultad y responsabilidad de este Tribunal el velar por la conducta debida, responsable y honrada de la clase togada en Puerto Rico. Este Tribunal no estaría cumpliendo con esa obligación si no considerara el comportamiento del querellado de epígrafe, según lo demostrado por la vista adversativa celebrada ante el Comisionado Especial, por lo que procede examinar la transcripción de dicha vista, así como las conclusiones de hecho que realizara el Comisionado a tenor con la prueba vertida. Pasamos a exponer y a evaluar la prueba.

IV

---

[5] Más aún, en In re Soto López, supra, establecimos que este Tribunal cuenta con la potestad de sancionar la conducta indebida de un abogado, aunque éste haya sido declarado inocente de cargos

Según surge de la prueba desfilada ante el Comisionado Especial, el señor Luis M. Vázquez Díaz prestó servicios al querellado mientras éste se desempeñaba como miembro del Senado de Puerto Rico. Estos servicios consistieron en representar al querellado en diversas actividades en la comunidad; en prestar ayuda a los ciudadanos; y en la realización de gestiones relacionadas con agencias gubernamentales y las personas que acudían a las mismas en busca de servicio público.

Antes de comenzar la prestación de dichos servicios, el señor Vázquez Díaz había sido miembro de la Policía de Puerto Rico, y fue separado de dicho cuerpo por razón de incapacidad ocupacional. En vista de ello, al momento de ser entrevistado por el querellado con el fin de reclutarle para el empleo en que prestaría sus servicios, el señor Vázquez Díaz le sugirió que se otorgara el contrato de empleo a nombre de su esposa, la señora Carmen L. Cruz Rosa. De esa manera pudieron obviar el obstáculo legal que impedía que Vázquez Díaz, como pensionado del Gobierno, recibiera una compensación adicional. En consecuencia, el querellado incluyó a la señora Cruz Rosa en la nómina del Senado como su empleada en el puesto de ayudante. Sin embargo, esa señora nunca prestó los servicios de ese cargo, siendo éstos realmente prestados por su esposo. Mediante dicho subterfugio la señora Cruz Rosa recibió la suma de $29,363.54 por concepto de sueldos.

De otra parte, el querellado autorizó y permitió que Benigna Montañez Agrinsoni y Lilliam Carrasquillo Flores figuraran en la nómina del Senado como sus ayudantes a tiempo completo. La señora Montañez Agrinsoni figuró en calidad de empleada transitoria por espacio de tres años y diez meses; durante dicho término devengó un sueldo de $800.00 mensuales. En total, la señora Montañez Agrinsoni recibió la suma de $39,464.01 por concepto de sueldos y beneficios marginales, sin que en realidad se desempeñara como empleada del Senado de Puerto Rico, ni prestara los servicios de esa posición. Por el contrario, surge de la prueba desfilada ante el Comisionado que, durante el aludido término, ésta se dedicaba a las funciones de su hogar como ama de casa. Durante la vista celebrada, varios vecinos de ésta corroboraron que estaba en su casa mientras se supone que ejercía como empleada de la oficina senatorial del querellado.

La señora Carrasquillo Flores también figuró como empleada del querellado en el Senado durante dos años y nueve meses, devengando una compensación mensual de $600.00. En total, recibió la suma de $21,221.55 por concepto de sueldos y

criminales basados en los mismos hechos que constituyen tal conducta impropia.

beneficios marginales. Ello sin que en realidad realizara las labores de su cargo, lo cual fue corroborado durante la celebración de la vista por la señora Marisol Ocasio Castro, quien laboraba como secretaria del esposo de Carrasquillo Flores en el Municipio de Canóvanas.

Los nombres de estas alegadas empleadas aparecían en las hojas de récord de asistencia y licencias, y en los informes bimensuales de asistencia para empleados regulares y transitorios del senado.[6] El querellado registró en estos documentos el balance de licencias por concepto de vacaciones regulares y enfermedad que, alegadamente, correspondía a las referidas empleadas.[7] No obstante, según surge del informe presentado por el Comisionado Especial, la evidencia documental presentada reflejó ciertas discordancias respecto a tales conceptos, las cuales no pudieron ser aclaradas durante la vista celebrada.

Específicamente, surge del récord de asistencia y licencias que Carrasquillo Flores y Montañez Agrinsoni se encontraban disfrutando de licencia por concepto de vacaciones regulares durante los días 9 y 25 de noviembre de 1988, el 23 de marzo de 1989 y el 12 de abril de 1990. Sin embargo, de los informes bimensuales de asistencia no surgen dichas ausencias. Además, en el caso de la señora Montañez Agrinsoni, el informe bimensual refleja que ésta estuvo ausente desde el 9 de mayo de 1988 al 31 de ese mismo mes, alegadamente disfrutando de una licencia por concepto de vacaciones regulares. No obstante, no surge de su récord de asistencia y licencias que la misma hubiese disfrutado de algún tipo de licencia durante el referido período.

Incluso, a tenor con el informe bimensual de asistencia, Montañez Agrinsoni no rindió labor durante los meses de junio, julio y agosto de 1988. Ello sin que tampoco surgiera del récord de asistencia que la misma estuviese disfrutando de algún tipo de licencia.

Finalmente, surge del informe bimensual, que Carrasquillo Flores no rindió labor durante el mes de diciembre de 1988, mientras que el récord de asistencia no informa al respecto.

Ante el Comisionado Especial, el querellado intentó demostrar que no existió conducta ilegal o indebida en el empleo de estas tres empleadas. El querellado alegó que como Senador mantenía un grupo de empleados en las facilidades de su oficina, y otro grupo de empleados denominados empleados de campo. Los empleados

---

[6]Véase la Forma del Senado SPR 37-24 de octubre de 1981, revisada en marzo de 1985, la cual indica las licencias por vacaciones regulares y por enfermedad. Dicho informe contiene los nombres de los empleados del Senado que "han rendido la labor que se les ha asignado" durante el período completo de cada año, según la certificación de corrección hecha por el Senador correspondiente o su representante autorizado. Véase Exhibit VII, págs. 130-141; y Exhibit XI, págs. 158-258.

[7]Exhibit VII, págs. 130-141.

de oficina cumplían con un horario regular de 8:30 a.m. a 5:00 p.m. Por su parte, los empleados de campo alegadamente realizaban labores fuera de la oficina, consistentes en diversas funciones en la comunidad y otras dirigidas a mantener al querellado informado de las necesidades de servicios públicos que demandaban los ciudadanos. El monto de la prueba desfilada, sin embargo, pesa rotundamente contra la defensa del querellado. Veamos.

Para los testigos Francisco Vélez Pabón, Minerva Maldonado Sáez y Sara Iris Velázquez Aponte, quienes eran funcionarios de la oficina del querellado en el Senado mientras éste se desempeñaba como miembro de ese foro, era evidente que las señoras Cruz Rosa, Montañez Agrinsoni y Carrasquillo Flores no eran empleadas de esa oficina. Los testigos expresaron que las mismas no asistían a la oficina, que sus cheques eran recogidos por sus esposos y que éstas no rendían informes de labor realizada.

De la prueba también se desprende que, mientras el querellado mantenía los nombres de las señoras Cruz Rosa, Montañez Agrinsoni y Carrasquillo Flores en los récords de asistencia de los empleados de la oficina, sin que lo certificado fuese cierto, el mismo no mantenía constancia de la labor supuestamente realizada por ellas. Se mantuvo esa situación hasta principios del 1990, cuando la prensa de Puerto Rico comenzó a informar sobre la intervención de la Oficina del Contralor que llevó a su descubrimiento de la alegada existencia de "empleados fantasmas" en otras oficinas del Senado. Ante esa situación, el querellado le ordenó a su secretaria, la señora Iris Velázquez Aponte, que preparase una guía de las labores que se supone que las señoras Cruz Rosa, Montañez Agrinsoni y Carrasquillo Flores habían realizado. Ante el Comisionado Especial, la señora Velázquez Aponte declaró que había preparado tal formulario, e inventado la información contenida. En la vista celebrada se estableció que el formulario fue entonces distribuido, con espacios en blanco, entre las señoras Cruz Rosa, Montañez Agrinsoni y Carrasquillo Flores, para que éstas completaran la información que faltaba de modo retroactivo. Las señoras devolvieron los formularios por medio de sus esposos. El querellado certificó los documentos como correctos, lo que constituyó un acto de falsedad, engaño y fraude, ya que éste bien sabía que las señoras Cruz Rosa, Montañez Agrinsoni y Carrasquillo Flores nunca llevaron a cabo las tareas descritas.

Durante la vista ante el Comisionado Especial, surgió de los Informes Bimensuales de Asistencia de mayo de 1988, de junio de 1989 y de enero de 1990, con relación a los cuales el querellado certificó mediante su firma y la de su representante Francisco Vélez Pabón, que la señora Montañez Agrinsoni estaba ausente de su trabajo en licencia regular del 9 al 31 de mayo de 1988, del 1 al

23 de junio de 1989 y del 1 al 8 de enero de 1990. Se desprende de estos récords que existe una contradicción insalvable en el hecho de que se representase y certificase como cierto o correcto que la señora Montañez Agrinsoni estuviese en las ocasiones de esas fechas disfrutando vacaciones y en el desempeño del trabajo simultáneamente. Idéntica situación ocurrió con relación a los referidos informes de labor de la señora Montañez Agrinsoni de junio, julio y agosto de 1988. Según los Informes Bimensuales de Asistencia, ella no se encuentra en la lista de las personas que rindieran labor en esos meses. Sin embargo, el informe de labor del modelo impreso correspondiente a estos meses representa que la misma se desempeñó en el trabajo.

El caso de la señora Carrasquillo presenta igual contrariedad. Según el Récord de Asistencia y Licencias y el Informe Bimensual de Asistencia, sometidos para la vista ante el Comisionado Especial, la señora Carrasquillo disfrutaba vacaciones regulares del 1 al 26 de junio de 1989. Sin embargo, el modelo impreso de dicho mes informa que ella se encontraba en el desempeño del trabajo.

Tampoco es posible encontrar conformidad entre los informes de labor de los modelos impresos de la señora Cruz Rosa para junio de 1989 y la primera quincena de enero de 1990 y el Récord de Asistencia y Licencias para esas fechas. Se desprende de la evidencia presentada ante el Comisionado Especial que, según los modelos impresos de esas fechas, la señora Cruz Rosa se desempeñó en el trabajo mientras que el referido récord de asistencia y licencias informa que disfrutó vacaciones regulares el mes de junio de 1989 y del 1 al 8 de enero de 1990.

Las señoras Cruz Rosa, Montañez Agrinsoni y Carrasquillo Flores prestaron testimonio ante el Comisionado Especial, pero no explicaron satisfactoriamente las discrepancias emanantes de los récords de personal.

La Oficina de la Contralor de Puerto Rico intervino en las cuentas de la Oficina del querellado a principios del 1990, cuando era Senador. Se nombró un Fiscal Especial Independiente, quien también investigó la relación que existía entre las aludidas empleadas y la oficina del querellado. Entonces se radicaron cargos ante el extinto Tribunal de Distrito de San Juan contra el querellado, la señora Montañez Agrinsoni y la señora Carrasquillo por violación al artículo 166(a) del Código Penal, supra. El querellado fue imputado de 218 cargos de apropiación ilegal agravada; la señora Montañez Agrinsoni fue imputada de 75 cargos; y la señora Carrasquillo fue imputada de 61 cargos. Carmen L. Cruz y su esposo, Luis M. Vázquez Díaz, recibieron inmunidad criminal, bajo la condición de que declararan la verdad de lo acontecido.

Previo acuerdo con el Ministerio Público, el querellado y las señoras Montañez Agrinsoni y Carrasquillo presentaron alegaciones de culpabilidad, no al

artículo 166(a) del Código Penal, sino al artículo 214 del mismo. El tribunal aceptó las alegaciones de culpabilidad y le impuso a cada uno una multa de $100 más el pago de las costas. También se sentenció a las señoras Montañez Agrinsoni y Carrasquillo a restituir cada una $30,000 al Estado Libre Asociado, cantidades que fueron pagadas por el querellado en esa fecha al Departamento de Hacienda.

V

Las anteriores determinaciones de hecho fueron formuladas por el Comisionado Especial y fundamentadas por la prueba desfilada ante él; éste presentó su informe el 10 de agosto de 1995. Ante ese informe, y luego de haber solicitado y recibido varias prórrogas, el querellado presentó su "Contestación al Informe del Honorable Examinador" el 16 de septiembre de 1996. En la misma, el querellado ataca la apreciación del Comisionado Especial sobre la prueba desfilada. Este Tribunal no está obligado a aceptar el informe de un Comisionado Especial, pudiendo adoptar el mismo, modificarlo, e, inclusive, rechazarlo, aun en ausencia de pasión, prejuicio, parcialidad o error manifiesto del Comisionado Especial al apreciar la prueba.

No obstante, nuestra tendencia es a no alterar las determinaciones de hechos que, como en este caso, estén sostenidas por la prueba testifical y documental. Véase In re: López de Victoria Brás, 135 D.P.R. 688 (1994); In re: Arroyo Fernández, 133 D.P.R. 364 (1993); e In re: Rivera Arvelo y Ortiz Velázquez, 132 D.P.R. 840 (1993).

La conducta deshonrada del querellado no ocurrió en el desempeño de la profesión de abogado. Al momento de los hechos imputados, el querellado ejercía las funciones de Senador, pero ese hecho no ajena a este Tribunal de su responsabilidad de ejercer sus funciones disciplinarias sobre el querellado, por ser éste un miembro de la clase togada. En In re: Abella, 67 D.P.R. 229 (1947), este Tribunal sostuvo que procede desaforar a un abogado si, por su conducta, ha demostrado que no es digno de ser miembro de ese título; eso aún si la conducta imputada no fue efectuada durante su ejercicio de la profesión de abogado.

Debemos puntualizar, además, que un abogado que se desempeña como legislador debe observar, en el ejercicio de sus funciones, una conducta que se atenga al cumplimiento de los cánones de ética profesional. Los principios de ética profesional se extienden, como hemos señalado, a actuaciones del abogado aunque estas hayan surgido por causas no relacionadas con el ejercicio de su profesión. Ciertamente se extienden a las actuaciones de un legislador, quien por razón de ser un funcionario público goza de la confianza del pueblo, la cual queda defraudada cuando el funcionario lleva a cabo actuaciones impropias como las que dan motivo a la presente acción disciplinaria. Además, las funciones legislativas, cuando son ejercidas por un abogado, no están desvinculadas del todo del "quehacer legal."[8]

En nuestra sociedad se percibe a los abogados de diversas formas. Muchas personas se limitan a componer chistes sobre la profesión. Hay los que describen a los abogados como gladiadores mercenarios que defienden sólo por paga. Otros saben lo que este Tribunal considera la verdad: la función de los abogados es

---

[8] Véase, por ejemplo el Canon 8 del *ABA Model Code of Professional Responsibility,* codificado en el *ABA/BNA Lawyers' Manual on Professional Conduct* EC 8-8, p. 01:345 que dispone:

> "[l]awyers often serve as legislators or as holders of other public offices. This is highly desirable, as lawyers are uniquely qualified to make significant contributions to the improvement of the legal system. A lawyer who is a public officer, whether full or part-time, should not engage in activities in which his personal or professional interests are or foreseeably may be in conflict with his official duties."

representar a sus clientes, para beneficiar a la comunidad en general, pues con cada caso se trata de hacer justicia. Una conclusión sobre la clase togada es, sin embargo, indudable: los miembros de la clase togada han servido a nuestra sociedad como líderes de nuestra civilización a través de su historia. La condición de ser sólo los licenciados los que pueden practicar la abogacía en Puerto Rico hace que la clase togada disfrute de ciertos privilegios. Esta posición privilegiada en nuestra sociedad le impone al abogado la obligación de mantener su imagen sin reproche legal o moral, irrespectivamente de la función que realice. De esta forma el abogado viene requerido de proteger su honor en la sociedad, así como el de la clase togada en general. La función de legislador ejercida por un abogado, no puede requerir menos.

A esos efectos dispone lo siguiente el Canon 38 de los de Etica Profesional:

"Canon 38. Preservación del honor y dignidad de la profesión

El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. Tal participación conlleva necesariamente asumir posiciones que puedan resultarle personalmente desagradables pero que redundan en beneficio de la profesión, tales como: denunciar valientemente, ante el foro correspondiente, todo tipo de conducta corrupta y deshonrosa de cualquier colega o funcionario judicial; aceptar sin vacilaciones cualquier reclamación contra un compañero de profesión que haya perjudicado los intereses de un cliente; poner en conocimiento de las autoridades apropiadas todo acto delictivo o de perjurio que ante él se cometiera; velar y luchar contra la admisión al ejercicio de la profesión de personas que no reúnan las condiciones morales y éticas, así como de preparación académica, que nuestra profesión presupone. Todo abogado debe estar convencido de las condiciones idóneas morales y éticas de un aspirante al ejercicio de la profesión antes de recomendarle para su admisión al foro.

Por razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida privada como en el desempeño de su profesión, debe conducirse en forma digna y honorable. En observancia de tal conducta, el abogado debe abstenerse en absoluto de aconsejar y asesorar a sus clientes en otra forma que no sea el fiel cumplimiento de la ley y el respeto al poder judicial y a los organismos administrativos. De igual modo, no debe permitir a sus clientes, sin importar su poder o influencia, llevar a cabo actos que tiendan a influencia indebidamente a personas que ejercen cargos públicos o puestos privados de confianza. Lo antes indicado no impide, naturalmente, que un abogado dé a sus clientes su opinión informada y honesta sobre la interpretación o validez de una ley, orden o reglamento, que no ha sido, a su vez, interpretado o clarificado en sus disposiciones por un tribunal competente.

Todo abogado que abandone el servicio público debe rechazar cualquier empleo o representación legal en aquellos casos particulares en relación con los cuales haya emitido juicio profesional como funcionario público." 4 L.P.R.A. Ap. IX, C.38.

La prueba desfilada ante el Comisionado Especial demuestra que el querellado faltó a su compromiso con la sociedad que le eligió para servirle como Senador y a la clase togada que confió en que éste mantendría su buen nombre. La práctica de mantener "empleados fantasmas" constituye una corrupción del más dañino calibre, pues al mantener tales "empleados" el querellado permitió que otros se apropiaran de fondos pertenecientes al pueblo, los cuales están disponibles para su desarrollo y mejor calidad de vida.

Al permitir este esquema ilegal, el querellado manchó su toga y deshonró el buen nombre de su profesión. El querellado sacrificó la confianza que nuestro pueblo deposita en aquellos que pueden actuar como licenciados para ejercer el derecho en Puerto Rico. Al empañar su honor, tiñó el de cada abogado ante los ojos de nuestra sociedad. No podemos ser clementes ante la vergonzosa y oprobiosa conducta del querellado. Su traición a la institución a la que pertenecía, al pueblo que lo eligió para que le representase, y a su profesión nos requiere decretar su suspensión indefinida del ejercicio de la abogacía.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re

Joaquín Peña Peña                    CP-1994-800

SENTENCIA

San Juan, Puerto Rico, a 27 de marzo de 2001.

Por los fundamentos expuestos en la Opinión Per Curiam que antecede, la cual se hace formar parte íntegra de la presente, suspendemos indefinida e inmediatamente del ejercicio de la abogacía a Joaquín Peña Peña, a partir de la notificación de esta Opinión, y le imponemos el deber de notificar a todos sus clientes de su presente inhabilidad de seguir representándolos, les devuelva cualesquiera honorarios recibidos por trabajos no realizados, e informe oportunamente de su suspensión a los distintos foros judiciales y administrativos del país. Deberá, además, certificarnos dentro del término de treinta (30) días a partir de su notificación el cumplimiento de estos deberes, notificando también al Procurador General.

El Alguacil General de este Tribunal deberá incautarse de la obra notarial del abogado suspendido, debiendo entregar la misma a la Directora de la Oficina de Inspección de Notarías para el trámite correspondiente.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados señores Rebollo López y Fuster Berlingeri disienten con opiniones escritas.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In Re:

Joaquín Peña Peña                    CP-1994-800

OPINIÓN DISIDENTE EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico a 27 de marzo de 2001

El hecho de que el Lcdo. Joaquín Peña Peña incurrió en conducta reprensible e ilegal, mientras ocupaba un escaño en el Senado de Puerto Rico, es incuestionable; <u>conducta que nadie puede excusar ni, mucho menos, aprobar</u>.

Ahora bien, para ser miembro de la Asamblea Legislativa de Puerto Rico <u>no</u> se requiere que la persona sea un abogado admitido, por este Tribunal, a la práctica de la profesión legal en nuestra jurisdicción. Debe quedar claro, además, que un abogado que es electo por nuestro pueblo para ocupar un escaño en la Legislatura <u>no</u> practica la profesión de abogado al actuar como legislador.

Conforme establece la Sección 9 de la Ley de 11 de marzo de 1909, 4 L.P.R.A. sec. 735, el Tribunal Supremo de Puerto Rico podrá suspender o destituir de su profesión a cualquier abogado que: (1) fuera convicto de un delito grave ("felony"); (2) hubiere sido convicto de delito menos grave ("misdemenor") en conexión con el ejercicio de su profesión; y (3) fuera convicto de delito menos grave que implique depravación moral.

A la luz de la disposición legal anteriormente señalada --y como, incluso, correctamente acepta la Mayoría-- el Lcdo. Joaquín Peña Peña no puede ser suspendido ni destituido de su profesión de abogado por este Tribunal; ello por la sencilla razón de que el Lcdo. Peña Peña no fue convicto por delito grave, ni por un delito menos grave en conexión con el ejercicio de la profesión, ni por delito menos grave que implique depravación moral.

Ante esta realidad jurídica, la Mayoría acude al "poder inherente" de este Tribunal para disciplinar a los abogados que ejercen su profesión en esta jurisdicción; poder inherente, conforme expresa la Mayoría, que nos faculta para disciplinar a los abogados por motivos distintos de aquellos que para el desaforo ha decretado por ley la Asamblea Legislativa.

No tenemos duda de que, en términos generales, este Tribunal tiene el poder inherente de reglamentar la profesión de abogado y que ese poder nos puede servir de base para, en ocasiones extraordinarias, desaforar a un abogado por razones ajenas a las establecidas por la antes citada Sección 9 de la Ley 11 de 1909. Ahora bien, ese poder no es irrestricto ni debe ser ejercitado arbitrariamente por este Tribunal en cualquier clase de situación.

I

En Amy v. Adm. del Deporte Hípico, 116 D.P.R. 414, 421 (1985), expresamos y establecimos que el "derecho a un empleo, esto es, a devengar ingresos y a tener una vida justa y decente, es un principio inalienable al hombre, preexistente a la más antigua de las constituciones conocidas."

El ejercicio de la profesión constituye, para los abogados, el "vehículo" para devengar ingresos y así poder obtener una vida adecuada para él y su familia. Amy v. Admor. del Deporte Hípico, ante.

El derecho constitucional a "ganarse la vida" le garantiza a todo abogado el derecho a saber, de antemano, cuando, por qué y en qué situaciones corre él el riesgo de perder su título. Dicho de otra forma, los abogados que, de ordinario, se pasan la vida reclamando para los demás el derecho a un debido proceso de ley tienen, también, ese derecho.

La norma que hoy establece este Tribunal --a los efectos de que <u>toda</u> conducta en que incurra una persona que es abogado que, <u>en opinión del Tribunal</u>, tenga el efecto de manchar su toga y deshonrar el buen nombre de su profesión, independientemente del hecho de que dicha conducta haya sido incurrida mientras dicha persona actuaba, o no, como abogado-- <u>es una que no sólo tiene el defecto de ser vaga e imprecisa sino que, de insistirse en ella, cuando menos debería tener carácter prospectivo</u>. Sólo así se cumpliría con el <u>requisito de notificación</u> que exige el debido proceso de ley.

La acción del desaforo, con las consecuencias graves y funestas que tiene para todo abogado, <u>no</u> puede ser llevada a cabo, de ordinario, por este Tribunal caso a caso, estableciendo, <u>sobre la marcha</u>, las normas que regirán la profesión. <u>Las mismas deben ser establecidas por el Tribunal de antemano y/o tener efectos prospectivos</u>. Conocer con antelación, <u>repetimos</u>, la conducta por la cual podemos ser sancionados es un requisito del debido proceso de ley. Debe mantenerse presente que el ejercicio del poder, de manera irrestricta, no conduce a nada bueno; situación de la cual los integrantes de este Tribunal no sólo tienen que estar muy pendiente sino que evitar a toda costa.

En el presente caso somos del criterio que <u>no</u> procede utilizar el poder inherente que tiene el Tribunal para reglamentar la profesión para desaforar al Lcdo. Peña Peña. La conducta delictiva observada por éste     --según <u>estipulada y aceptada</u> por el Departamento de Justicia en el proceso de alegación pre-acordada-- <u>ni tan siquiera puede ser calificada como que implica depravación moral</u>. En fin de cuentas, el Lcdo. Peña Peña fue convicto de un <u>delito de negligencia</u>.

Este <u>no</u> estaba consciente, <u>ni</u> había sido advertido, de que una convicción bajo esas circunstancias podía conllevar su desaforo como abogado. El desaforo hoy decretado bajo esas circunstancias constituye, a nuestro juicio, una violación del debido proceso de ley.

Utilizar nuestro poder inherente para reglamentar la profesión de esta manera, y privar a un abogado de su medio de ganarse la vida, conlleva el establecimiento de un <u>precedente peligroso</u> que puede desembocar, <u>en el futuro</u>, en decisiones arbitrarias por parte de este Tribunal.

Es por ello que disentimos.


FRANCISCO REBOLLO LÓPEZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

IN RE:

JOAQUIN PEÑA PEÑA                    CP-94-800

Opinión Disidente emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 27 de marzo de 2001.

En el caso de autos, la mayoría del Tribunal decreta la suspensión indefinida del querellado del ejercicio de la abogacía, porque éste supuestamente incurrió en la práctica de contratar "empleados fantasmas" mientras ocupaba el cargo de Senador en la Asamblea Legislativa de Puerto Rico.

No cabe duda de que la práctica que se le imputó al querellado es altamente reprochable. Todo servidor público tiene el deber de desempeñar el cargo que ocupa con completa devoción al bien común, lo que incluye administrar los fondos públicos a su disposición con la mayor pulcritud y eficacia. Ello es particularmente cierto de funcionarios electos de alta jerarquía, como

son los miembros de la Asamblea Legislativa, sobre quienes está depositada en gran medida la confianza pública en el régimen de gobierno democrático. Faltar al grave deber fiduciario que tiene un Senador —si ello fue lo que ocurrió aquí— merece el repudio severo de todos en el país. Exigiría, además, **que las autoridades correspondientes**, en particular las del propio cuerpo legislativo al que pertenecía el querellado, tomasen las medidas legales pertinentes para sancionar al que actuó de modo tan execrable.

Sin embargo, debo disentir del dictamen de la mayoría en este caso, por varias razones distintas. En primer lugar, el caso de autos presenta un problema muy serio, sobre el cual me he expresado antes. Según señalé en mi opinión disidente en In re: Deynes Soto, Resolución del 28 de junio de 1996, 141 D.P.R. ___, 96 JTS 109, considero inaceptable que se encause disciplinariamente a un abogado por unos alegados hechos que fueron imputados inicialmente en unas denuncias penales **que luego el Ministerio Público retiró**, como parte de un acuerdo con el imputado de no seguir adelante con su procesamiento penal a base de tales denuncias. Como he indicado antes, tal proceder me parece injusto e impropio. El Ministerio Público no debe inducir a un abogado a llegar a un acuerdo, en virtud del cual éste hará alegación de culpabilidad por unos hechos, para luego, de manera sorpresiva, procesarle disciplinariamente por la alegada comisión de otros hechos más graves, que ya habían sido descartados en el proceso penal. Es engañoso que se eluda el deber de probar los hechos imputados más allá de toda duda razonable, para luego tratar de penalizar al imputado por los mismos hechos, mediante una querella ética, con la cual se persigue sancionar al abogado por tales hechos, con graves consecuencias para éste, sin tener que satisfacer el peso de la prueba penal. Todo ello me parece una cruda distorsión de los procesos disciplinarios, para lograr a través de ello lo que no se puede conseguir en el encausamiento criminal.

En el caso de autos, el Ministerio Público inicialmente presentó varias denuncias contra el senador por el delito de **apropiación ilegal agravada**, que acarrea una pena de reclusión por un término fijo de diez (10) años, por cada cargo. Más adelante, sin embargo, el Ministerio Público aceptó, en lugar del procesamiento por los delitos graves imputados, que el abogado se declarase culpable de un delito **menos grave** de omisión en el cumplimiento de un deber en su cargo de miembro del Senado de Puerto Rico. **Sólo se le impuso una pena de $100 de multa**.

Diez meses más tarde, el Procurador General de Puerto Rico presentó una querella ante este Tribunal en contra del abogado referido, por los hechos que se le imputaron inicialmente por el Ministerio Público en el proceso penal pero que éste luego descartó, a cambio de que el querellado se declarara culpable del delito menos grave mencionado antes.

Si el Ministerio Público no cuenta con la prueba para acusar por delitos graves —o si tal prueba no existe— no debe encausar a la persona. Mucho menos debe llegar

a un acuerdo con el imputado, para luego tratar de lograr en el proceso disciplinario lo que no pudo establecer en el proceso penal.

Una de las consecuencias lamentables de este proceder indebido la tenemos palpablemente en el caso de autos. Ante el Comisionado que entendió en este asunto, el querellado negó vehementemente que él hubiese incurrido en la práctica de contratar empleados fantasmas. Presentó prueba considerable, tanto testifical como documental, de que los empleados en cuestión prestaron los servicios para los cuales fueron contratados, que el Comisionado descartó. Se trata de prueba que en un proceso penal hubiera dado lugar a dudas razonables. Ahora, impugnada ante nos la apreciación de la prueba que hizo el Comisionado Especial, tenemos la odiosa tarea de decidir si hay fundamentos suficientes en el expediente para privar del ejercicio profesional a un abogado por una conducta que en el procesamiento penal sólo mereció una multa de $100, con la anuencia del Ministerio Público.

II

En segundo lugar, tengo graves reservas respecto al uso de la autoridad disciplinaria de este Tribunal en casos como el de autos. Tratamos aquí con una situación de conducta **personal** impropia incurrida **fuera del ámbito del desempeño profesional**. No tenemos ante nos el tipo de caso que ordinariamente atendemos en nuestros procesos disciplinarios por violación a los Cánones de Etica. Como el querellado en este caso **no fue convicto de delito grave** por los actos que se le imputan, ni se trata de una conducta relacionada con el ejercicio de la abogacía, este caso levanta para mí la grave interrogante de cuál debe ser nuestra función como Tribunal Supremo respecto al tipo de conducta impropia referida. No cuestiono que tenemos la **autoridad** para intervenir en situaciones como la de autos. La reserva que tengo es en cuanto a si debemos ejercer tal autoridad; es decir, si nuestro rol propio incluye en convertirnos en fiscalizadores aun de la conducta **personal** de los abogados.

Con frecuencia, en el pasado hemos tenido ante nos, directa o indirectamente, numerosas situaciones de conducta personal impropia de abogados, **que no estaba conectada con su desempeño profesional**. **De ordinario, en tales situaciones no hemos actuado para desaforar indefinidamente al abogado**, como ahora lo hace la mayoría en el caso de autos. En algunas de las situaciones aludidas, la conducta impropia privada o personal del abogado había sido incluso delictiva, pero no decretamos medidas disciplinarias como tal sólo por ello. La conducta personal de abogados referida, que no ha provocado sanciones rigurosas en el pasado de nuestra parte, incluye situaciones como las siguientes:

1) Falta de pago de impuestos.

2) Falta de pago de deudas privadas.

3) Conducir en estado de embriaguez.

4)   Adulterio.

5)   Alteración a la paz.

6)   Homicidio involuntario.

7)   Prácticas comerciales impropias.

8)   Violencia doméstica.

9)   Expresiones difamatorias.

10)  Agresión.

Antes de este caso, pues, este Tribunal no ha tenido como norma la de imponer rigurosas sanciones disciplinarias por la conducta reprochable de un abogado, en casos en los cuales la conducta en cuestión no había sido desplegada en el ejercicio de la profesión, ni había dado lugar a una convicción por delito grave. Hasta ahora **no hemos pautado** una normativa integral **que asegure un trato igual**, justo e imparcial, para atender de manera **consecuente** las numerosas y diversas instancias en las cuales abogados del país incurren en conducta personal impropia, fuera del ámbito del desempeño profesional. No hemos definido claramente cuál es nuestro rol respecto a estos tipos de conducta impropia de abogados, ni tenemos establecido un marco jurídico adecuadamente conceptualizado que nos permita adjudicar debidamente, con plena justificación y con objetividad, casos como el de autos. Por ello, me encuentro muy renuente a coincidir con la decisión mayoritaria de inmiscuirnos ahora en este asunto, sin una reglamentación del asunto que sea adecuada, a pesar de que estimo que la conducta imputada es de por sí muy reprobable.

III

En resumen, pues, en mi criterio este Foro no debe hacerse parte de un proceder del Ministerio Público que raya en lo engañoso, sobre todo cuando ello supone un uso inusitado del régimen disciplinario que va más allá de sus fines más propios y de su particular entramado procesal. Por todo ello, debo disentir del dictamen de la mayoría, a pesar de compartir el criterio de que ninguna persona, sea abogado o no, debe incurrir en la deleznable práctica que aquí se le ha imputado al querellado.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO