ORDEN
Debido a la no intervención del Juez Asociado Señor Re-bollo López y la Jueza Asociada Señora Rodríguez Rodrí-guez, se constituye una Sala Especial integrada por el Juez Presidente Señor Hernández Denton, el Juez Asociado Se-ñor Rivera Pérez y la Juez Asociada Señora Fiol Matta, para entender y disponer del caso CP-2005-8, In re Santiago Ríos.
Lo decretó y firma:
(Fdo. )Federico Hernández Denton

Juez Presidente

CERTIFICO:
(Fdo.) Aida Ileana Oquendo Graulau

Secretaria del Tribunal Supremo

Salvador J. Antonetti Stutts, procurador general, Marian D. Negrón Vargas, subprocuradora general, Miriam Soto Contreras, procuradora general auxiliar, y Maite D. Oronoz Rodríguez, subprocuradora general, parte querellante; Hermes F. Acevedo Lebrón, abogado del querellado; Pedro Santiago Ríos, pro se.
per curiam:
El licenciado Pedro Santiago Ríos (licenciado Santiago Ríos) fue admitido al ejercicio de la profesión de la abogacía en 1975. El presente procedimiento disciplina-rio plantea la formulación de una serie de cargos por con-ducta que se alega viola los Cánones 21, 37 y 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX.
I
El 19 de febrero de 2004 el Contralor de Puerto Rico, honorable Manuel Díaz Saldaña (Contralor), presentó una queja juramentada ante el Tribunal Supremo de Puerto Rico contra el Ledo. Carlos Rivera Vicente, socio propieta-rio del bufete Cancio Nadal, Rivera, Díaz y Berrios (CNRD & B) y el Ledo. Pedro Santiago Ríos, socio a cargo de la División de Derecho Ambiental de CNRD & B. En síntesis, alegó que ambos abogados incurrieron aparentemente en conducta constitutiva de violación a los Cánones 21, 37 y 38 del Código de Ética Profesional.(1) Los hechos que die-ron origen a la queja presentada surgieron de la auditoría que el Contralor realizó a la Autoridad de Desperdicios Só-lidos (ADS), agencia a la cual CNRD & B ofrecía sus ser-vicios legales. El 3 de junio de 2004 fue remitida una copia del expediente de la queja presentada por el Contralor a la Oficina del Procurador General para la investigación e in-forme correspondientes. En vista de que, contra el licen-ciado Carlos Rivera Vicente ya existía un procedimiento *807 disciplinario sobre los mismos hechos, se presentó una mo-ción para la bifurcación de las quejas, para así atenderlas por separado. Dicha moción fue declarada “con lugar” el 17 de diciembre de 2004.
Posteriormente, la Procuradora General Auxiliar, Leda. Miriam Soto Contreras, presentó una querella juramen-tada contra el licenciado Santiago Ríos conforme a la in-vestigación realizada. En ésta alegó que el querellado se apartó de los exigentes postulados que disponen los Cáno-nes 21, 37 y 38 del Código de Ética Profesional, supra. El 14 de marzo de 2006, el Procurador General y la represen-tación legal del licenciado Santiago Ríos presentaron ante el Comisionado Especial un informe de conferencia con an-telación a la vista en su fondo. Dicho documento, unido a un informe suplementario presentado el 24 de mayo de 2006, constituyeron la base para las determinaciones del informe del Comisionado Especial. En síntesis, el Comisio-nado Especial concluyó que, en las circunstancias presentes y en función de la conducta desplegada por el licenciado Santiago Ríos, sólo procedía imputarle una violación al Canon 38 del Código de Ética Profesional, supra.
Con el beneficio de dichos documentos y teniendo en cuenta que la trayectoria profesional del licenciado Santiago Ríos fue estipulada por las partes, procedemos a eva-luar los cargos imputados. En vista de que la alegada con-ducta imputada surge en ocasión de su puesto como Presidente de Puerto Rico Infrastructure Management Group, Inc. (PRIME), expondremos la génesis de dicha cor-poración y la relación existente entre esta última, el bufete CNRD & B y ADS. Veamos.
rH hH
El Ledo. Pedro Santiago Ríos (licenciado Santiago Rios) obtuvo en 1961 el grado de Ingeniería Química del Colegio de Agricultura y Artes Mecánicas de Mayagüez, actual Re- *808 cinto Universitario de Mayagüez, Universidad de Puerto Rico. En 1963, luego de licenciarse del ejército, ocupó va-rias posiciones en la Commonwealth Oil and Refining Company, Inc. —también conocida como CORCO— tales como Ingeniero de Procesos, Director de Área en las petro-químicas y Gerente General de las plantas petroquímicas.
El 20 de mayo de 1975 fue admitido al ejercicio de la profesión de la abogacía. A partir de esa fecha se trasladó al Departamento Corporativo de Leyes de la CORCO, donde laboró hasta su renuncia en 1992. En enero de 1992 comenzó a trabajar como abogado del bufete CNRD & B, donde dirigió la División de Derecho Ambiental. A princi-pios de 1994, ADS contrató al bufete CNRD & B para reci-bir su asesoría legal, principalmente en el área adminis-trativa y en el área ambiental. En particular, CNRD & B atendió lo relativo a un Plan de Infraestructura Regional para Reciclaje y Disposición de Desperdicios Sólidos de Puerto Rico (Plan). No obstante, CNRD & B no tuvo inter-vino en la elaboración del Plan. La implementación del Plan correspondía a ADS y tenía como objetivo incorporar estrategias y tecnologías recientes para la disposición de los desperdicios sólidos en Puerto Rico.(2) El Plan respon-día a una exigencia de la United States Enviromental Protection Agency, conocida por sus siglas EPA, ante un inmi-nente cierre de los vertederos en Puerto Rico. Para estas fechas el licenciado Santiago Ríos ocupaba el puesto de Director de la División de Derecho Ambiental de CNRD & B y, como tal, mantuvo una participación activa en la discu-sión, el desarrollo y la implementación de los proyectos de ADS desde el bufete CNRD & B.
Durante la vigencia de dichos contratos, CNRD & B pre- *809 sentó a ADS el concepto Integrated Services Partnership Group, Inc., también denominado como “el Consorcio”. Este concepto fue creado por el Ledo. Carlos Rivera Vicente (licenciado Rivera Vicente), entonces socio propietario del bufete CNRD & B, con el propósito de atender las agendas y los proyectos complejos en los sectores público y privado. Específicamente, el Consorcio pretendía aglutinar varias entidades de modo tal que, una vez contratadas, prestasen los servicios de forma multidisciplinaria para colaborar con la implementación del Plan. Cabe destacar que el Consor-cio fue la génesis de PRIME, corporación con fines de lucro creada por el licenciado Rivera Vicente e incorporada el 16 de octubre de 1998. (3) Dicha corporación se creó como un organismo integrador de servicios y tenía a su cargo coor-dinar la gerencia de los proyectos de infraestructura del Plan, entre ADS y los expertos contratados para éste. Es en este momento que el licenciado Santiago Ríos renunció a CNRD & B para ocupar entonces el puesto de Presidente de PRIME, conforme a la oferta hecha por el licenciado Rivera Vicente.
El 18 de septiembre de 1998, el licenciado Rivera Vicente hizo una propuesta a la ADS para la implementación del Plan a través de PRIME.(4) Después de evaluar varias ofertas, ADS contrató los servicios de PRIME. En vista de ello, las partes se reunieron y comenzaron a elaborar un contrato denominado “Management Assistance Service Agreement” (contrato MASA). No obstante, durante el pro-ceso de preparación del contrato MASA, la Leda. Marie Code, Directora de la División Legal de ADS, planteó a CNRD & B la existencia de un posible conflicto de intereses. *810 Específicamente, manifestó su preocupación en tomo al rol de PRIME, los servicios que éste brindaría a ADS y cómo trabajarían juntos. Por tal motivo, PRIME contrató una re-presentación legal ajena a CNRD & B para atender lo refe-rente al contrato entre ambos.(5) Además, para evitar mayo-res preocupaciones, CNRD & B terminó el contrato de servicios profesionales que tenía con ADS.
El 15 de enero de 1999 se firmó el contrato entre PRIME y ADS.(6) En la otorgación del contrato MASA concurrieron las partes siguientes: ADS, representado por su Directora Ejecutiva, la ingeniera Roxana Longoria Ferrer; el Departa-mento de Recursos Naturales, representado por su Secreta-rio, el ingeniero Daniel Pagán Rosa, y la Corporación PRIME, representada por su Presidente, el licenciado Santiago Ríos. Por acuerdo entre las partes, se dispuso que la División Legal de ADS tendría a su cargo la revisión y los ajustes a las facturas de CNRD & B por los servicios reali-zados en lo relativo al Plan.
Una vez constituido el contrato entre ADS y PRIME, el licenciado Rivera Vicente, mediante una misiva dirigida al licenciado Santiago Ríos, le ofreció los servicios de asesoría legal de CNDR & B para la implementación del Plan. PRIME aceptó la oferta, y el 23 de marzo de 1999 se suscri-bió el contrato entre PRIME y CNRD & B.
No obstante, algunos desacuerdos en los ajustes realiza-dos en las facturas de CNRD & B provocaron que el licen-ciado Santiago Ríos suscribiera una carta a la división le *811 gal de ADS en la que solicitó que se reconociera lo facturado por CNRD & B.(7) ADS entendió que la reacción del licenciado Santiago Ríos constituyó una postura favorable para CNDR & B y contraria a los intereses de ADS.
Es a la luz de los hechos expuestos que el Procurador General, en su querella contra el licenciado Santiago Ríos, le imputó la violación a los Cánones 21, 37 y 38 del Código de Ética Profesional, supra. Particularizó la conducta del modo siguiente:
[F¡ ungir como abogado [del Bufete Cando Nadal, Rivera, Díaz y Berrios], el cual tuvo varios contratos de servicios con la ADS y bufete donde dirigió la División Ambiental partici-pando, conjuntamente con el Ledo. Carlos Rivera Vicente (socio propietario del mismo), en la creación de una corporación con la información obtenida mediante su relación profesional con ADS que implementaría el plan de manejo de desperdicios só-lidos en la Isla [.]

[C\esar funciones en el bufete e inmediatamente convertirse en Presidente de PRIMEU

[S]ubcontratar, en representación de PRIME, al mismo bu-fete donde había trabajado anteriormente, como los asesores legales de PRIME, particularmente en la implementación del contrato entre dicha corporación [PRIME] y ADS[.]
[B]eneficiar y favorecer al bufete, por encima y en contraven-ción a los mejores intereses de la ADS, instrumentalidad a la cuál, a fin de cuentas, le respondía y se debía PRIME. (Enfasis suplido.) Querella, págs. 4-5.
Sin embargo, el Comisionado Especial, luego de evaluar la prueba presentada, las estipulaciones de las partes y los hechos que dieron lugar a la formulación de su querella, *812 concluyó, en lo que respecta al Canon 21 del Código de Etica Profesional, supra (Canon 21):
[C]onsideramos que no existe evidencia que demuestre que existió una relación de abogado-cliente entre el querellado y PRIME, el querellado y ADS luego de que éste fuera designado como Presidente de PRIME. (Énfasis suplido.) Informe del Co-misionado Especial, pág. 14.
En cuanto a la violación al Canon 37 del Código de Ética Profesional, supra, concluyó:
De las estipulaciones presentadas por las partes surge, sin lugar a dudas, que el [licenciado] Santiago Ríos tiene una pre-paración académica [y] profesional que le habilitaba para ser considerado para presidir a PRIME.
... [E]n ausencia de evidencia en contrario ... lo más razo-nable es concluir que el querellado era un candidato idóneo para ser nombrado Presidente de PRIME y la consideración para su nombramiento fue esa. ... No existe, tampoco eviden-cia de que el querellado actuara como abogado y ejecutivo de PRIME de manera simultánea en algún momento, agenci[á]ndose beneficios por su participación generando, para sí, trabajo profesional lucrativo. El canon 37, a nuestro juicio, no es de aplicación. Informe del Comisionado Especial, págs. 14-15.
En cuanto a la violación al Canon 38 del Código de Ética Profesional, supra, también concluyó:
Argumenta el Procurador General que es violatorio del canon 38 el beneficiarse de información obtenida mediante su relación profesional con ADS, cesar funciones en el bufete e inmediatamente integrarse a PRIME como su Presidente. ... [Señala, además, el Procurador General como violación al Canon 37, supra, el] subcontratar con el mismo bufete donde había trabajado anteriormente ... beneficiando a su anterior patrono, el bufete, en contravención a los mejores intereses de ADS, instrumentalidad que le respondía a PRIME.
Por su parte [,] el querellado entiende que no violó el canon 38 ya que no se evidenció perjuicio contra nadie o lucro personal, a su favor. ...
Sin embargo, el enfoque que la prensa del país le dio a este asunto, así como los cuestionamientos públicos que de manera *813 reiterada se suscitaron, tienen un innegable efecto en la ima-gen de la profesión legal. ...
[E]l Comisionado Especial considera que se violó el canon 38 pero, en grados de intensidad atenuados, siendo la lesión a la imagen de la profesión legal mínima. Informe del Comisionado Especial, págs. 15-17.
í — H HH M
 En atención a las violaciones imputadas, procede-mos a evaluar lo que contempla el Canon 21 del Código de Ética Profesional, el cual dispone, en lo pertinente, lo si-guiente:
El abogado tiene para con su cliente un deber de lealtad completa. Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las par-tes y con terceras personas, y cualquier interés en la contro-versia que pudiera influir en el cliente al seleccionar su consejero. Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales.

No es propio de un profesional el representar intereses encontrados. Dentro del significado de esta regla, un abogado representa intereses encontrados cuando, en beneficio de un cliente, es su deber abogar por aquello a que debe oponerse en cumplimiento de sus obligaciones para con otro cliente.

La obligación de representar al cliente con fidelidad incluye la de no divulgar sus secretos o confidencias y la de adoptar medidas adecuadas para evitar su divulgación. Un abogado no debe aceptar la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de otro cliente anterior ni servir como árbitro, especialmente cuando el cliente anterior le ha hecho confidencias que puedan afectar a uno u otro cliente, aun cuando ambos clientes así lo aprueban. Será altamente impropio de un abogado el utilizar las confi-dencias o secretos de un cliente en perjuicio de éste. (Enfasis suplido.)
El conflicto de intereses dispuesto en el Canon 21 pre-senta tres situaciones que deben ser evitadas por todo abo-gado: (1) que, en beneficio de un cliente, abogue por aquello a lo que el letrado debe oponerse en cumplimiento de sus *814 obligaciones para con otro cliente; (2) que un abogado acepte la representación de un cliente en asuntos que pue-dan afectar adversamente cualquier interés de un cliente anterior, y (3) que un abogado acepte una representación legal, o que continúe en ella, cuando su juicio profesional pueda ser afectado por sus intereses personales. De este modo se pretende evitar una conducta profesional que mine el principio cardinal de confianza en que debe funda-mentarse toda relación fiduciaria entre un abogado y su cliente.(8) La relación abogado-cliente es de naturaleza fi-duciaria y está fundada en la honradez absoluta.(9) Asi-mismo, se funda en el deber de lealtad y de confidenciali-dad de todo abogado para con su cliente.(10)
El abogado tiene la obligación de representar a su cliente con total lealtad, ejercer un criterio profesional in-dependiente y desligado de sus propios intereses, no divul-gar los secretos y las confidencias que el cliente haya com-partido durante el transcurso de sus representaciones pasadas y presentes.(11) En consecuencia, los abogados no sólo deben evitar el conflicto de intereses actual, sino tam-bién el potencial.(12) Basta con que el conflicto sea potencial para imponer al abogado la obligación de renunciar a la representación del cliente afectado.(13) La situación no va-ría por el hecho de que alguien crea que dicha posibilidad es o no altamente especulativa. (14)
El Canon 21 abarca, además, el conflicto de inte- *815 reses por la representación múltiple y la representación sucesiva de clientes. La representación sucesiva de clientes con intereses adversos presenta el peligro especial de que el abogado viole el principio de la confidencialidad,(15) pri-vilegio que subsiste aún luego de finalizada dicha representación.(16) Para determinar si existe un conflicto por representación sucesiva se tiene que demostrar una re-lación sustancial o adversa entre la controversia legal en la que el abogado comparece actualmente en su contra y la materia o causa de acción en la que dicho abogado repre-sentó inicialmente. Sin embargo, el criterio de relación sus-tancial no requiere probar una violación actual al principio de confidencialidad, por lo que cobija cualquier violación potencial dentro del marco de dicha relación.(17) Es decir, basta probar que la controversia en el pleito actual está relacionada sustancialmente con la materia o causa de ac-ción anterior.(18)
Como vemos, el conflicto de intereses proscrito por el Canon 21 comprende tanto el conflicto de intereses perso-nales como el conflicto de obligaciones. La primera ver-tiente sostiene que el conflicto existe cuando los intereses personales del abogado interfieren con la representación adecuada y efectiva del cliente, al ser éstos incompatibles, dificultando de este modo el deber de lealtad hacia su cliente.(19) En su segunda acepción, el conflicto de obliga-ciones existe cuando las representaciones simultáneas o sucesivas están en conflicto con su deber de guardar confi-dencias que ostenta el abogado con cada uno de sus clientes.(20)
Es deber de todo abogado cerciorarse de que no *816 represente intereses encontrados o incompatibles entre sí.(21) Además, el abogado tiene que cuidarse de que sus actuaciones no den margen a la más leve sospecha de que promueve o defiende intereses encontrados con los de su cliente.(22) En caso de que surja alguna sospecha, es deber del abogado desligarse de la representación profesional que ostenta.(23) De este modo, se garantiza la más completa independencia de su juicio por parte de los abogados al desempeñar funciones profesionales y se evita que se ero-sione la confianza pública en las instituciones de justicia.(24)
Es importante señalar que la prohibición sobre conflicto de intereses requiere la existencia de una relación de abogado-cliente,(25) De ser así, se debe determinar si ello implica representar intereses encontrados o incompatibles.(26) o que puedan serlo potencialmente.(27) En conse-cuencia, es imprescindible determinar inicialmente si existe una relación abogado-cliente. Esto lo hemos reite-rado en decisiones anteriores donde, por un conflicto de intereses, hemos impuesto una sanción disciplinaria al amparo del Canon 21.(28)
La relación abogado-cliente es una relación sui generis que responde en gran medida a las inexorables exigencias éticas de esta profesión.(29) La doctrina moderna define la relación abogado-cliente como una relación múl- *817 tiple, compuesta de las diferentes funciones que desem-peña un abogado. Cada una de estas funciones crea una relación diferente y particular con un grado de responsabi-lidad variable.(30) El abogado puede desempeñarse como consejero, intermediario, defensor, auditor, legislador pri-vado y negociador. No obstante, esta relación comienza cuando el cliente acude al abogado a requerir sus servicios profesionales para que lo asesore o le represente en algún asunto.(31)
El Procurador General alegó en su querella que la con-ducta del licenciado Santiago Ríos generó una situación de conflicto de intereses. Aduce, principalmente, que esta con-ducta se constituyó cuando, luego de cesar sus funciones en el bufete CNDR & B, fungió como Presidente de PRIME y subcontrató como los asesores legales de PRIME al mismo bufete donde había trabajado. No le asiste razón.
EL Procurador General y la representación legal del li-cenciado Santiago Ríos, en el informe de conferencia con antelación a la vista en su fondo, estipularon que una vez el licenciado Santiago Ríos renunció a CNRD & B, dejó de fungir como abogado, y que como Presidente de PRIME sus funciones eran gerenciales. Este hecho fue aceptado por el Procurador General.
Las estipulaciones de hechos contenidas en el informe de conferencia con antelación al juicio —sobre las cuales no existe controversia alguna— evidencian que en ningún momento el licenciado Santiago Ríos fungió como abogado de PRIME. Es menester señalar que el deber de lealtad exigido profesionalmente a los abogados en el Canon 21 se quebranta cuando se representan intereses encontrados o se entremezclan intereses personales con aquellos sustancialmente relacionados con el ministerio de la repre- *818 sentación legal. Según expresamos antes, es esencial dis-tinguir entre la relación abogado-cliente y las otras activi-dades que con frecuencia los abogados desempeñan. Conforme a ello, para ejercer nuestra jurisdicción discipli-naria, la conducta en cuestión tiene que desarrollarse den-tro de una relación que haya adquirido la naturaleza de abogado-cliente.
Coincidimos con el criterio del Comisionado Especial, el cual expresó que el licenciado Santiago Ríos actuó tanto al contratar con ADS como al aceptar los servicios profesiona-les de CNRD & B, en su carácter de Presidente de PRIME. Es razonable concluir que la preparación académica de un ingeniero químico, como tal, era altamente beneficiosa para cumplir con los propósitos de la corporación PRIME. En vista de ello, el licenciado Santiago Ríos aceptó, como bien podía hacerlo, el nombramiento que se le hizo. Desde el momento cuando decidió ocupar dicho puesto, éste re-nunció a CNDR & B y dejó de ofrecer sus servicios legales a todas las partes en cuestión, razón por la cual no era su deber abogar en calidad de letrado en beneficio de un cliente por aquello a lo que debía oponerse en cumpli-miento de sus obligaciones como abogado para con otro cliente. Más aún, de los hechos presentados no surgió evi-dencia de que PRIME tuviese una División Legal atendida por el licenciado Santiago Ríos.
Conforme a lo anterior, y reiterando el criterio de que el Comisionado Especial designado por el Tribunal Supremo para atender un caso disciplinario está en mejor posición de aquilatar la prueba presentada, concedemos deferencia a la determinación de que no se violó en la situación de hechos aquí presente el Canon 21. Encontramos que, en este aspecto, las determinaciones de hechos estuvieron sostenidas por la evidencia presentada en el expediente.
*819 IV
En cuanto al Canon 37 del Código de Ética Profesional, supra (Canon 37), éste dispone lo siguiente:
La participación del abogado en negocios o actividades de venta de bienes, agencias de cobro, fianzas u otros servicios comerciales propios o pertenecientes a otras personas no es una actividad propia de la buena práctica de la profesión si tal negocio o actividad tiene el fin directo o indirecto de proporcio-narle trabajo profesional lucrativo que de otra forma el bufete no hubiese obtenido. (Énfasis suplido.)
Dicho canon prohíbe que un abogado se dedique, ya sea directa o indirectamente, al negocio de fianzas o a alguna otra actividad que fuese incompatible con el ejercicio de la profesión.(32) Preceptúa que no es una actividad propia de la buena práctica de la profesión, la participación de un abogado en negocios o actividades de venta de bienes u otros servicios comerciales, propios o pertenecientes a otras personas, si tal negocio o actividad tiene el fin directo o indirecto de proporcionarle trabajo profesional lucrativo que de otra forma el bufete no hubiese obtenido.(33) Ahora bien, si el negocio no genera servicios legales adicionales para el abogado, no existe tal violación. De acuerdo con lo anterior, en In re Ramírez Ferrer, 147 D.P.R. 607 (1999), determinamos que un abogado que fungía como agente de una casa hipotecaria y no prestaba servicios legales vio-laba el Canon 37, supra.
Por otro lado, la situación actual presenta cada vez más, como un hecho palpable, el que una persona posea más de una título académico. Debido a ello, el profesional en cues-tión está legítimamente habilitado para desempeñar, con entera libertad, cualquiera de las profesiones para las cua-les está capacitado. Consciente de la pluralidad de funcio-nes que desempeña un abogado, la American Bar Associa *820 tion promulgó un reglamento modelo en el que considera los distintos tipos de conflictos que surgen entre los aboga-dos y sus clientes.(34) Sin embargo, tanto en el referido re-glamento como en nuestro Código de Ética Profesional es esencial distinguir entre la relación abogado-cliente y el desempeño del abogado en otra profesión ajena al ejercicio de la abogacía.(35) Por ende, un abogado puede libremente dedicarse a actividades ajenas a su profesión siempre y cuando no realice dicha actividad con el fin directo o indi-recto de proporcionarle trabajo profesional lucrativo que de otra forma el bufete no hubiese obtenido. (36)
De la evidencia presentada y conforme a las estipulacio-nes de hechos realizadas por las partes no surge que el licenciado Santiago Ríos haya utilizado su puesto de Pre-sidente de PRIME con el fin directo o indirecto de propor-cionarse trabajo profesional lucrativo que de otra forma no hubiese obtenido.(37) Cabe señalar que surge de las estipu-laciones de hechos que el licenciado Santiago Ríos no par-ticipó en la formación de la corporación PRIME y que re-nunció al bufete CNRD & B antes de ocupar el puesto como Presidente de dicha corporación. Así pues, al contratar con ADS, era a ésta a quien, en última instancia, rendía sus servicios.
El Procurador General sostiene en su querella que el licenciado Santiago Ríos supo de la disponibilidad del puesto de Presidente de PRIME mientras era abogado de CNRD & B. Sobre tal hecho, no se presentó evidencia alguna que el licenciado fungiera como abogado y ejecutivo de PRIME de manera simultánea en algún momento, agenciándose beneficios por su participación como Presidente *821 de PRIME. Además, hay que señalar que el criterio a uti-lizarse en un proceso disciplinario es el de prueba clara, robusta y convincente,(38) no afectada por reglas de exclu-sión ni a base de conjeturas.(39) Se requiere una carga pro-batoria más acuciosa que la mera preponderancia de la prueba, ya que en estos procesos está en juego el título de un abogado y, por ende, su derecho fundamental a ganarse su sustento.(40)
En vista de lo anterior, resolvemos que no se ofreció evi-dencia que nos permita concluir que el licenciado Santiago Ríos violó el Canon 37.
V
El Canon 38 del Código de Ética Profesional, supra (Canon 38), entre otras cosas, dispone lo siguiente:
El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. ...
Por razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida pri-vada como en el desempeño de su profesión, debe conducirse en forma digna y honorable. (Énfasis suplido.)
La práctica de la abogacía está revestida de un alto in-terés público, la cual requiere de una estricta observancia y reglamentación.(41) Distinto quizás a otras profesiones, dicha práctica conlleva una seria y delicada función ciuda-dana, pues representa servicio, ética y ejemplo.(42) Por ello, al interpretar este canon hemos señalado que la apariencia de conducta impropia puede resultar muy perniciosa al *822 respeto de la ciudadanía por sus instituciones de justicia y por la confianza qüe los clientes depositan en sus abogados.(43)
En repetidas ocasiones este Tribunal ha adver-tido que por ser los abogados el espejo donde se refleja la imagen de la profesión, éstos deben actuar con el más es-crupuloso sentido de responsabilidad que impone la fun-ción social que ejercen.(44) El abogado tiene el deber de lu-cir puro y libre de influencias extrañas a su gestión profesional, y en el descargo de sus responsabilidades pro-fesionales, debe cuidar que sus actuaciones no den margen a la más leve sospecha de que promueve intereses suyos . encontrados con los de su cliente.(45) Ello implica que todo abogado tiene el deber de desempeñarse con dignidad y alto sentido del honor, y aunque ello conlleve ciertos sacri-ficios personales, deberá conducirse en forma digna y honorable, tanto en la vida privada como en el desempeño de su profesión.(46) Es conveniente recordar que el deber de comportarse conforme exige el citado Canon 38 aplica tanto dentro como fuera de la profesión. En otras palabras, un abogado que actúe de manera impropia no podrá justi-ficar su conducta aduciendo que no se relaciona con la pro-fesión de la abogacía.(47)
El Procurador General argumentó en la querella contra el licenciado Santiago Ríos que la conducta violatoria al Canon 38 se configuró cuando al cesar como abogado de CNRD & B, aceptó el puesto de Presidente de PRIME. Ex- *823 presó, además, que se apartó de las exigencias del Canon 38 al subcontratar el mismo bufete donde había trabajado anteriormente.(48) Asimismo, sostuvo que la carta que sus-cribió el licenciado Santiago Ríos, en reacción a un des-acuerdo con la revisión de una factura enviada por ADS, dio la apariencia de que el licenciado Santiago Ríos asumió una posición favorable al bufete CNRD & B y perjudicial a ADS. No coincidimos con ese criterio.
La carta cursada por el licenciado Santiago Ríos, aun cuando en efecto fue una reacción a los ajustes realizados en las facturas, manifestaba la disposición de asistir a la ADS en la recopilación de la información necesaria para aclarar dicha problemática. Además, de una lectura integral de ésta se desprende el interés por resolver la contro-versia en aras de favorecer los mejores intereses de todas las partes y, consiguientemente, promover el mejor desa-rrollo del Plan. Cabe destacar, además, que como Presi-dente de PRIME, el licenciado Santiago Ríos podía mostrar un interés legítimo en asegurarse de que las entidades subcontratadas por el Consorcio no enfrentaran inconve-nientes a la hora de cobrar sus servicios.
Por su parte, el Comisionado Especial expresó que la proximidad del licenciado Santiago Ríos con el bufete CNRD & B pudo haber ocasionado algún grado de suspica- *824 cia o recelo en el público en general, lesionando así la ima-gen de la profesión legal. No obstante, en lo que respecta a este asunto, el Comisionado Especial en su informe ex-presó que “[l\a prueba estipulada no aporta información mayor que nos permita concluir, con rotundidad, sobre este aspecto, razón por la cual dejamos de sobreextendernos”. (Énfasis suplido.) Informe del Comisionado Especial, pág. 17. La conducta imputada ha de ser aquella que realmente le haga indigno de pertenecer a este foro. A esos fines, se debe analizar si la conducta imputada realmente afecta las condiciones morales del abogado.
Por lo tanto, con los hechos aquí presentes no es razo-nable concluir que la conducta desplegada por el quere-llado atentó contra la comunidad o contra la profesión en general.
VI
En virtud de los fundamentos que preceden, concluimos que la conducta desplegada por el licenciado Santiago Ríos no constituyó una violación a los Cánones 21 y 37 ni revis-tió la gravedad que contempla el Canon 38 del Código de Ética Profesional. Por lo tanto, declaramos “sin lugar” la querella presentada en su contra y ordenamos el archivo del asunto.
La Jueza Asociada Señora Fiol Matta concurrió sin opi-nión escrita.

 4 L.P.RA. Ap. IX.

 El 19 de abril de 1998, mediante la Orden Ejecutiva Núm. 18, el honorable Pedro Rosselló, entonces Gobernador del Estado Libre Asociado de Puerto Rico, elevó el referido plan a política pública. El 15 de enero de 1999, mediante la Resolución Núm. 99-02, suscrita por el ingeniero Daniel Pagán, Secretario del Departamento de Recursos Naturales y Ambientales, creó el Plan de Infraestructura Regional para Reciclaje y Disposición de Desperdicios Sólidos de Puerto Rico (Plan).

 El licenciado Rivera Vicente era el accionista mayoritario de dicha corpora-ción en un 75%, y el Dr. Manuel Morales recibía un 25% de las acciones emitidas. Ambos eran quienes designaban la Junta de Directores de PRIME.

 No obstante, entre 1996 y 1997, además de presentarse a la Autoridad de Desperdicios Sólidos (ADS), el concepto se presentó a varias agencias de gobierno tales como Turismo, el Departamento de Salud y el Banco Gubernamental de Fo-mento, entre otras.

 El contrato entre PRIME y la ADS estuvo a cargo del Ledo. Carlos Ruiz Cox, bajo la dirección del licenciado Santiago Ríos y de la Leda. Marie Code de ADS.

 Mediante este contrato se propició la privatización de gran parte de las áreas técnicas, operacionales y legales de ADS. En el contrato “Management Assistance Service Agreement” (contrato MASA) se certificó que PRIME no tenía ningún con-flicto de interés o de política pública con ADS.
En atención a ello, se incluyó entre sus cláusulas el establecimiento de un “Permanent Joint Executive Comitee” para tener un mecanismo para discutir asuntos de envergadura que afectaran la implementación del Plan y para que la ADS fiscalizara directamente el contrato de servicios profesionales entre ADS y PRIME. Además, en el referido contrato se acordó que en la subcontratación que realizaría PRIME, se esta-blecería que los subcontratistas estarían igualmente obligados al cumplimiento de las disposiciones del contrato MASA en cuanto aplicara a sus respectivos servicios.

 La carta fue suscrita el 7 de octubre de 1999 y, entre otras cosas, expresaba lo siguiente:
"... El ajuste drástico de las facturas se ha convertido en la norma y no en la excepción, a nuestro juicio, por causas ajenas a nuestra voluntad y fuera de nuestro control. Ejemplo de ello es que ha sido la propia ADS quien ha requerido los servicios de CNRD & B, a través de PRIME. La prudencia exige que la determinación de la ADS sea en unión a PRIME con la asistencia del subscribiente. De ser necesario estamos en la mejor disposición de asistir a la ADS en la recopilación de toda la información indispensable que evite esta problemática. En última instancia, la repe-tición de este patrón de conducta no favorece los mejores intereses de ninguna de las partes y en forma alguna promueve el adelanto de los proyectos de infraestructura, lo cual es nuestra meta común

 In re Avilés, Tosado, 157 D.P.R. 867, 882 (2002); In re Sepúlveda Girón, 155 D.P.R. 345, 355 (2001). Véase, además, In re Toro Cubergé, 140 D.P.R. 523 (1996).

 In re Vélez Barlueca, 152 D.P.R. 298, 309 (2000); In re Belén Trujillo, 126 D.P.R. 743, 754-755 (1990); In re Pereira Esteves, 131 D.P.R. 515 (1992); In re Rivera Carmona, 114 D.P.R. 390 (1983).

 In re Avilés, Tosado, supra.

 In re Dennis Vélez Barlueea, supra; Liquilux Gas Corp. v. Berrios, Zaragoza, 138 D.P.R. 850, 857-858 (1995); Robles Sanabria, Ex parte, 133 D.P.R. 739 (1993).

 In re Bonilla Rodríguez, 154 D.P.R. 684, 694 (2001).

 Íd.

 Íd.; Fed. Pese. Playa Picúas v. U.S. Inds., Inc., 135 D.P.R. 303, 319 (1994).

 In re Carreras Rovira y Suárez Zayas, 115 D.P.R. 778 (1984).

 In re Guzmán, 80 D.P.R. 713 (1958).

 In re Carreras Rovira y Suárez Zayas, supra.

 Otaño v. Vélez, 141 D.P.R. 820 (1996).

 In re Belén Trujillo, supra. Véase, además, In re Bonilla Rodríguez, supra.

 In re Rivera Vicente, 172 D.P.R. 349 (2007).

 Íd.

 In re Roldán González, 113 D.P.R. 238, 242-243 (1982).

 Íd.

 In re Palou Bosch, 148 D.P.R. 717, 725 (1999).

 In re Soto Cardona, 143 D.P.R. 50 (1997).

e) In re Pizarro Santiago, 117 D.P.R. 197 (1986).

 Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172 (1985).

 In re Pizarro Santiago, supra; In re Carreras Rovira y Suárez Zayas, supra; In re Rojas Lugo, 114 D.P.R. 687 (1983); In re Roldán González, supra; In re Concepción Suárez, 111 D.P.R. 486 (1981); In re Martínez Rivera, 106 D.P.R. 239 (1977).

 López de Victoria v. Rodríguez, 113 D.P.R. 265 (1982).

 Íd.

 In re Belén Trujillo, supra.

 In re Clavell Ruiz, 108 D.P.R. 259 (1978).

 In re Rivera Vicente, supra; In re Roldán Figueroa, 106 D.P.R. 4 (1977).

 In re Belén Trujillo, supra, págs. 755-756, citando Annotated Model Rules of Professional Conduct, Reglas 1.1 a 1.9 (1984).

 In re Belén Trujillo, supra.

 In re Rivera Vicente, supra; In re Roldán Figueroa, supra; In re Clavell Ruiz, 106 D.P.R. 257 (1977).

 In re Rodriguez Mercado, 165 D.P.R. 630 (2005).

 In re Pizarra Santiago, supra.

 In re Caratini Alvarado, 153 D.P.R. 575 (2001).

 Íd.

 In re Negrón Negrón, 163 D.P.R. 586 (2004).

 In re Cuyar Fernández, 163 D.P.R. 113 (2004); In re Cintrón Colón, 161 D.P.R. 778 (2004); Ramos Acevedo v. Tribunal Superior, 133 D.P.R. 599, 613 (1993).

 In re Rivera Vicente, supra; In re Fernández de Ruiz, 167 D.P.R. 661 (2006).

 In re Ortiz Brunet, 152 D.P.R. 642, 556 (2000); In re Silvagnoli Collazo, 154 D.P.R. 533 (2001).

 In re Morell, Alcocer, 158 D.P.R. 791 (2003).

 In re Quiñones Ayala, 165 D.P.R. 138 (2005).

 In re Peña Peña, 153 D.P.R. 642 (2001); In re Astado Caraballo, 149 D.P.R. 790 (1999); In re Belk, Serapión, 148 D.P.R. 685 (1999); In re Martínez, Odell I, 148 D.P.R. 49 (1999); In re Ramírez Ferrer, 147 D.P.R. 607 (1999); In re Rivera Cintrón, 114 D.P.R. 481, 491 (1983); Colegio de Abogados de P.R. v. Barney, 109 D.P.R. 845 (1980).

 Cabe señalar que en In re Rivera Vicente, supra, atendimos la relación contractual entre PRIME y el bufete Cancio, Nadal, Rivera, Díaz y Berrios (CNRD & B), para resolver si tal actuación colocó al licenciado Rivera Vicente en un conflicto o potencial conflicto entre su deber de lealtad hacia ADS y las obligaciones asumidas con PRIME como subcontratistas. A esos efectos, citando a In re Semidey Morales, 151 D.P.R. 842 (2000), expresamos que “conviene tener en mente que el Canon 21, supra, contempla que un abogado sea contratado por un tercero para ofrecer servi-cios legales a determinado cliente y que, incluso, sea ese tercero quien pague sus honorarios. En tales casos, el cliente es la persona cuyo interés representa el abo-gado, aunque haya sido un intermediario quien contrató con él”. íd., pág. 366. Con-secuentemente, resolvimos que “la relación abogado-cliente conlleva que el abogado despliegue completa lealtad hacia su cliente y, por su parte, [que] la relación [de CNRD & B] con PRIME también suponía cierto grado de lealtad. [A/]oda en el expe-diente indica que ambas exigencias fueran incompatibles. ... Además, en previsión a cualquier conflicto potencial y en cumplimiento con las pautas establecidas en el Canon 21, supra, las partes acordaron que el Bufete nunca representaría legalmente a PRIME”. (Enfasis suplido y escolio omitido.) íd., págs. 366-367.